# Court of Appeals.

## June 6, 1893.

## PEOPLE v. WILLIAM G. TAYLOR.

### (52 St. Rep. 914; 138 N. Y. 398.)

**1. Appeals—Court of appeals.**

In exercising the jurisdiction conferred by section 528 of the Code of Criminal Procedure in capital cases, the court of appeals will be governed by the practice regulating the review of questions of fact upon appeal to the supreme court, and, in such cases, if there is a fair conflict in the evidence, or it is such that different inferences can be properly drawn from it, the determination of the jury will not be interfered with, unless it is clearly against the weight of evidence, or appears to have been influenced by passion, prejudice, mistake or corruption.

**2. Criminal law—Province of jury.**

Under our system of jurisprudence it is the exclusive province of the jury to determine whether the evidence, pointing to the guilt of the accused, is so lacking in convincing force as to leave an intelligent and discriminating mind in doubt as to the truth of the charge contained in the indictment.

**3. Same—Reasonable doubt.**

When the jury, by their verdict, have declared that no such condition of mental uncertainty has arisen from a contemplation of the evidence, the prisoner has had the full benefit of the rule which protects him from punishment unless his crime is established beyond a reasonable doubt, and the question is not open for review in the court of appeals, unless the case is so weak that the verdict should be set aside because against the weight of evidence, or for other sufficient cause.

**4. Homicide—Insanity.**

An insane delusion with reference to the conduct and attitude of another cannot excuse the criminal act of taking his life, unless it is of such a character that, if it had been true, it would have rendered the homicide excusable or justifiable.

**5. Same.**

The existance of any delusion may be considered, in determining whether the defendant is so far mentally sound as to be conscious that he is doing a prohibited act.

**6. Same.**

> If, when a specific act is contemplated, the accused has the power to know whether it is wrong to do it and right to refrain from doing it, the law presumes that he has also the power to choose between the right and the wrong course of action and will not permit either courts or juries to speculate as to its possible nonexistence.

**7. Same.**

> A desire for self destruction and the adoption of means to secure it do not, of themselves, indicate a mental impairment which has advanced to the stage of irresponsibility.

**8. Trial—Charge.**

> Single expressions cannot be dislocated from the context of a charge and construed as though they were the statement of separate and independent propositions; but the entire exposition of the law upon a given point by the court must be taken.

Appeal from the Cayuga county oyer and terminer, convicting defendant of the crime of murder in the first degree.

Frank C. Cushing for appellant.

Adelbert P. Rich, dist. att'y, for respondents.

MAYNARD, J.—Judgment of death has been pronounced upon the defendant, William G. Taylor, a convict in the state prison at Auburn, for killing Solomon Johnson, a fellow convict, on September 20, 1892. The felonious act was executed with great deliberation, and had, evidently, been long premeditated. The method of it accomplishment was planned with great cunning and forethought, and every element, apparently, existed which the law requires to be present in order to establish this most atrocious crime. Counsel, assigned by the court to defend the prisoner, have discharged that most delicate and responsible duty with great diligence and fidelity, and have urged a reversal of this judgment upon the sole ground of the legal irresponsibility of the defendant for the offense of which he has been convicted. It is manifest that this defense has some basis upon which to rest, and that it has not been invented to meet the exigencies of the trial. In determining whether the verdict was against the weight of evidence, or whether justice demands that a new trial shall be had, it becomes incumbent

upon us to make a careful and critical examination of the evidence in view of the previous history and conduct of the defendant.

The defendant has been living the life of a felon since 1886, when he was sentenced to Dannemora prison upon a conviction for burglary, for a term of three years, which expired in the summer of 1888, having received the usual commutation for good behavior. Very soon after his discharge, and in the same year, he was returned to the prison to serve out two sentences for burglary, aggregating about eleven years. From the time of his readmission his conduct was exemplary with a single exception. He was obedient and tractable, and readily submitted to all of the requirements of the prison discipline until April 28, 1890, when, without provocation or warning, he assaulted his keeper with a hatchet and felled him to the floor. He was immediately seized and placed in close confinement. His demeanor was such as to lead the prison physician to suspect that he might be insane.

He was therefore closely watched and examined daily, and this physician reached the conclusion that he was suffering from that form of insanity known as melancholia. His physical symptoms indicated the correctness of the diagnosis. He had the stolid appearance, the slow muscular movements, the flabby, tremulous and coated tongue, and the slow and weak pulse, usually observable in such cases. When questioned as to his purpose in assaulting the keeper, he always told the same story, that he had concealed the hatchet in his cell on Saturday to enable him to dig his way out and escape, and failing in that, and knowing that his attempt would be detected, and believing that he would not outlive his sentence, he knocked the keeper down, not intending to kill him, but to secure his revolver and kill himself. He avoided the association of others and wished to be allowed to remain in his cell, saying that he thought he would either kill himself or some one else if he was allowed the liberty a prisoner was usually given. On September 29, 1890, he was transferred as an insane convict to the asylum for insane criminals at Auburn, and in the certificate of transfer the prison physician stated, among other things, "I believe him to be suffering from temporary melancholia, and not a safe man to keep

in state prison, as he is both suicidal and homicidal. I would, therefore, suggest caution and watchfulness in handling him, as I think he is bent on escape at any cost."

The defendant was detained in the asylum until September 20, 1891, when the entry "not insane" was made in the "case book" opposite his name, and he was transferred to the prison and put to work in the broom shop. The medical superintendent of the asylum states that during this period he was sane, and this entry was made by his direction. The assistant superintendent, in whose charge the defendant was, and who had, perhaps, better opportunities to know his mental condition, objected to this entry as not correctly describing his status, and testifies that during all the time there was a doubt in his mind as to his sanity; that while he expressed no well-defined delusions, his facial aspect and actions were those of a man not mentally sound, and that he favored making an entry that he was recovering, which would indicate that he had been insane and might have a recurrence of the attack, while the statement "not insane" would be construed to mean that he had always been sane; but yielding to the directions of his superior, he made the entry as stated.

The defendant and deceased worked in the same shop and at benches a few feet apart. The latter was a quiet, inoffensive man, and between the two friendly and somewhat intimate relations seem to have existed for some months. From the time of his admission, in September, 1891, until the homicide, the defendant's prison record was good. He was quiet, self-contained, diligent, industrious and skillful in his work, and was never reported for any misbehavior. It appears, from the testimony of several of the convicts who worked in the same shop, that, in the month of April, he exhibited, without any apparent cause, a feeling of great hostility to the deceased. The professed occasion for it was, as he claimed, that he had been thwarted in a scheme which he had formed of making his escape by means of a gateway which was in process of construction between the asylum and the prison grounds, and that the deceased had informed the prison authorities of his design, and thus caused its failure. It would seem that his plan of escape was not a rational one, if he ever really entertained it; it does

not appear that he ever confided it to the deceased; or that the latter had ever informed anyone in regard to it; or that any person had told the defendant that the deceased had given any such information; and we think that the weight of the evidence favors the conclusion that his feelings in this respect towards the deceased were the offspring of an insane delusion. From the defendant's manner, the deceased became apprehensive of bodily harm and he was, at his own request, transferred to a distant part of the shop, where he would not be within reach of the defendant. During the summer the defendant frequently threatened to kill the deceased, because the latter had, as he believed, informed upon him, and there was no intercourse between them until the day before the homicide, when the defendant, upon his own motion, affected a reconciliation and established friendly relations with the deceased, and seems to have regained his confidence. The next afternoon, when the work of the day was over and all the other convicts had left the shop, the defendant lured him into a shed under the shop upon the pretense that he had some contraband articles to show him, and there killed him with a knife which he had concealed upon his person, almost completely severing the head from the body. Without displaying any trace of emotion or excitement, and with his arms folded, he walked to the office of the principal keeper and, exhibiting the knife dripping with blood, told him that if he would go down under the shop, he would find a carcass there. When questioned as to the motive which prompted the deed, he said that he had to do one of three things, either starve to death, or kill the deceased or kill himself, and that he did it in order to be "electrocuted," and that he did not want his execution to be delayed.

The loss of commutation for good behavior, which he had incurred by his conduct at Dannemora, seemed to weigh heavily upon his mind, and he apparently despaired of his physical ability to survive the full period of his sentence, and his prison life had become so unendurable that he desired to put an end to his own existence, which he conceived he could not do except in one of the three ways indicated. His morbid condition of mind was aggravated by the effects of a pernicious habit, which he believed had wrecked him both physically and mor-

ally; and by his belief that there were many other prisoners in the same condition; that they would be greatly benefited by a change of prison management; and that it was necessary to kill someone to attract attention to the matter and bring about a reform; that his first intention was to kill the warden, but not having an opportunity, he decided to kill a fellow-convict, and selected the deceased because he had been placed as a spy over him, and had informed the authorities of his plan of escape.

The trial was had on January 10, 1893, less than four months after the homicide, and it is shown that there was no change in the mental condition of the defendant during that time. He refused to aid his counsel in the preparation of his defense, or give him any specific information in regard to his previous life or his family, and repeatedly stated in substance to the physician who examined him that he didn't want any nonsense about the thing, and didn't want his trial postponed, but wanted it quickly over, and "to be electrocuted."

He was thrice examined by the assistant physician of the asylum between the time of the homicide and the trial, who unhesitatingly pronounced him insane, and added that in his opinion he was a dangerous lunatic, and suffered from melancholia, with homicidal delusions. He was also examined three times by another physician, who had given some special study to the subject of insanity, who reached the same conclusion. Both of these physicians say that upon each examination he exhibited a marked tremor, or independent twitching of the small fibres of the tongue, which is characteristic of lunatics. He also had the well-recognized facial expression indicating melancholia and other physical symptoms of that form of mental disturbance, such as cold and clammy hands, and the involuntary movement of the muscles about the mouth. The prison physician at Dannemora affirmed upon oath the truth of the statement contained in the transfer certificate, that he believed him then to be insane, with suicidal and homicidal tendencies.

On the part of the prosecution five medical experts were examined, and all of them were of the opinion, clearly and unequivocally, that the defendant was sane. This opinion was not based upon hypothetical questions or an assumed state of facts, but was derived from repeated personal examinations. All

the witnesses had given special study and attention to the subject of insanity. One of them was the medical superintendent of the asylum, in whose charge the defendant had been for a period of a year, who had spent a large portion of his professional life in the care and treatment of insane persons, and is now the superintendent of the state hospital for insane convicts at Matteawan. Another was the prison physician, who saw the defendant at the time of the homicide, and who, with his associate, made a careful examination of him the following day; and another witness had attended the defendant professionally shortly before the crime was committed. They all, therefore, had adequate means for the formation of a correct judgment as to his mental condition. No one of them discovered any of the physical symptoms of insanity described by the defendant's witnesses.

In this state of the evidence the issue of sanity was a proper subject for final determination by the jury, and we do not think that this court, even if it possessed the power, should disturb their verdict. But the rule is now firmly established by repeated decisions of this court, that in exercising the jurisdiction conferred by section 528 of the Criminal Code in capital cases, we shall be governed by the practice regulating the review of questions of fact upon appeal to the supreme court, and that in such cases, if there is a fair conflict in the evidence, or it is such that different inferences can be properly drawn from it, the determination of the jury will not be interfered with, unless it is clearly against the weight of evidence, or appears to have been influenced by passion, prejudice, mistake or corruption. People v. Loppy, 128 N. Y. 629; 40 St. Rep. 410; People v. Trezza, 125 N. Y. 740; 36 St. Rep. 149; People v. Fish, 125 N. Y. 136; 34 St. Rep. 840; People v. Stone, 117 N. Y. 480; 27 St. Rep. 823.

If, in the judgment of this court, there was a rational doubt of the guilt of the defendant, it would not be a sufficient ground for reversal. Under our system of criminal jurisprudence, it becomes the exclusive province of the jury to determine whether the evidence pointing to the guilt of the accused is so lacking in convicting force as to leave an intelligent and discriminating mind in doubt as to the truth of the charge contained in the indictment.

When the jury, by their verdict, have declared that no such condition of mental uncertainty has arisen from a contemplation of the evidence, the prisoner has had the full benefit of the rule of law which protects him from punishment unless his crime is established beyond a reasonable doubt, and the question is not open for review in this court, unless the case is so weak that the verdict should be set aside because against the weight of evidence, or for other sufficient cause.   The charge of the trial judge upon this point was full and explicit, and eminently fair to the defendant.   The jury were told that upon the issue of the defendant's sanity, as upon every other controverted question in the case, the defendant is entitled to the benefit of every doubt which is reasonable, which can be reasonably entertained by a reasonable man; and this proposition was reiterated and emphasized, so that it must have been prominently and pervasively in the minds of the jury when they retired for their final deliberation.

Counsel relies with great confidence upon the proof of an insane delusion as to the part which the deceased had taken in preventing the execution of the defendant's plan of escape, but this delusion, if established, would not of itself be a sufficient answer to the present indictment.   It may be that if the question of its existence were separately submitted to a jury they might find, as we might be compelled to find, if submitted to us, that the weight of evidence seems to indicate its existence. That fact, if conclusively established, would fall far short of a defense.   An insane delusion with reference to the conduct and attitude of another cannot excuse the criminal act of taking his life, unless it is of such a character that, if it had been true, it would have rendered the homicide excusable or justifiable. If the defendant had actually planned a mode of escape from prison, and had confided his scheme to the deceased, and the latter had betrayed his confidence, and informed the authorities of his purpose, and by means of such information it had been frustrated, it would have afforded the defendant no justification for his act, but would have augmented its enormity, because inspired by the unholy motive of revenge.   How then can the false belief, standing by itself, that these things had happened, affect the criminal nature of the defendant's wrong?

The existence of such a delusion, or of any delusion, might be considered, and doubtless was considered by the jury in this case, in determining whether the defendant was so far mentally sound as to be conscious that he was doing a prohibited act.

The provision of the Revised Statutes, part 4, chapter 1, title 7, section 2, which declared that "No act done by a person in a state of insanity can be punished as an offense," was abrogated by the Penal Code, which provided, section 17, that responsibility is to be presumed, and the burden of disproving it is upon the accused, and, section 21, that he cannot be excused from criminal liability as an insane person, except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason as either to know the nature and quality of the act he was doing or that the act was wrong. Partial insanity, or incipient insanity, is not sufficient, if there is still the ability to form a correct perception of the legal quality of the act and to know that it is wrong. If, when a specific act is contemplated, he has the power to know whether it is wrong to do it and right to refrain from doing it the law presumes that he has also the power to choose between the right and the wrong course of action, and will not permit either courts or juries to speculate as to its possible non-existence. Eminent alienists criticise the rule of the Penal Code, because it excludes consideration of the question whether the accused possessed sufficient powers of self-restraint to forbear the commission of an act which he clearly perceived to be criminal. They contend that it is unreasonable and unjust to punish a human being for that which he does not have the power to refrain from doing, but if such a result may follow, which we by no means admit, it is an argument to be addressed to the body which makes the law, and not to the tribunal whose sole duty it is to construe, apply and enforce it.

The learned physicians who testified that, in their judgment, the defendant was insane and irresponsible, candidly admitted that they did not approve of the statutory measure of responsibility, and that their opinion was not circumscribed by it, and that the defendant, when he killed the deceased, undoubtedly knew that the act was a violation of the law of the state. It must be admitted that he so understood it, for it is evident that

it was planned and executed in order that he might expose himself to the extreme penalty which follows its commission. He has uniformly and consistently adhered to the declaration that his principal object was to terminate his own existence by meriting the punishment of death. The proof is thus very strong and conclusive that he correctly recognized the legal quality of his act and truly appreciated its criminal character. Here, again, it is urged that if his real motive was to eventually compass his own death, it should be accepted as evidence of a disordered mind. While this may be considered in connection with other circumstances in determining the issue of insanity, it is not entitled to controlling weight. A desire for self-destruction and the adoption of means to secure it do not of themselves indicate a mental impairment which has advanced to the stage of irresponsibility, otherwise the law would not make the attempt to kill one's self a crime.

The verdict of the jury in this case is fortified by the report of a special commission appointed pursuant to the provisions of section 658 of the Criminal Code. Before sentence was pronounced the defendant's counsel moved for the appointment of this commission to determine his present sanity, and the trial court appointed a physician of high standing, and eminent in his profession as a specialist in the treatment of the insane, to make the examination. The commissioner was attended by the district attorney and the counsel for the defendant; all the evidence taken at the trial and appearing in this record was read to him; the hearing occupied three days, and it is evident that it was of the most searching and impartial character, and the learned commissioner reported that after having heard the evidence, and personally examined the defendant on several different occasions and obtained his family history, he is of the opinion that the defendant was sane at the time of the examination and is now sane. As it is quite clear from the evidence before us that the defendant's mental condition at the time of the trial was not in any material respect different from what it was at the time of the homicide, this report renders it highly improbable that any error of judgment was committed by the jury in determining the principal issue submitted to them.

We think the witness, Mead, was properly allowed to charac-

terize as rational or irrational the acts and conversations of
the defendant which he had detailed. The evidence was ad-.
missible within the rule repeatedly recognized in this court.
Paine v. Aldrich, 133 N. Y. 544; 44 St. Rep. 308; People v. Con-
roy, 97 N. Y. 62; Clapp v. Fullerton, 34 id. 190. Similar ques-
tions were put to the other witnesses who had only stated in
general terms the acts and conversations which they were per-
mitted to characterize. Under a strict application of the rule,
these had not been described with sufficient minuteness of detail
to render an opinion as to their rational or irrational character
competent, but no objection was made to the evidence, and it is
to be assumed on appeal that if objection had been made on
that ground, it would have been obviated, and we cannot see
that the defendant was materially prejudiced by its admis-
sion.

It is insisted that the charge to the jury contained an erron-
eous instruction to the effect that the defendant was responsi-
ble for his act if he had sufficient mental vigor and capacity to
distinguish between right and wrong in the abstract. We do
not think the charge was fairly susceptible of such a construc-
tion. The learned trial judge instructed the jury with great
clearness and precision upon the statutory rule of responsibility
for crime, and directed their minds to the very point upon
which the rule rests, and repeatedly charged them, in substance,
that if the defendant's mind was so far impaired or deranged
as to render him incapable of knowing the nature and quality
of the act he was perpetrating, or that the act was wrong, he
should be acquitted, and that if they had any reasonable doubt
upon the subject he should be given the benefit of it. Wher-
ever reference is made throughout the charge to the power of
discrimination between right and wrong, it is evident that the
particular act charged in the indictment is intended, and the
jury must have so understood it. Single expressions cannot
be dislocated from the context and construed as if they were the
statement of separate and independent propositions; but the
entire exposition of the law upon a given point by the judge
must be taken, and when the charge is so analyzed it is ap-
parent that no error was committed; but the prisoner was ac-

corded the benefit of every rule which has been established for his protection.

The judgment of conviction must, therefore, be affirmed.

All concur, PECKHAM and O'BRIEN, JJ., in result.