## The People of the State of New York, Respondent, *v.* Norman L. Horton, Appellant.

Argued June 3, 1954; decided December 2, 1954.

2

*Judson R. Hoover, Charles Swan* and *Osco W. Peterson* for appellant. I. The verdict of the jury was contrary to the evidence. (*People* v. *Crum,* 272 N. Y. 348; *People* v. *Peller,* 291 N. Y. 438.) II. Defendant's statutory and constitutional rights were invaded, thereby depriving him of a fair trial. (*People* v. *Samuels,* 302 N. Y. 163; *People* v. *Strait,* 148 N. Y. 566; *People* v. *Hawkins,* 109 N. Y. 408; *People* v. *Corey,* 157 N. Y. 332.) III. The court erred in permitting the admission of the testimony of Dr. Nathan Cohen and Dr. Rudolph Schwarz. IV. The Trial Judge erred in refusing to allow counsel for defendant to establish the facts upon which the People's psychiatrists based their opinion. V. The action of the District Attorney in producing in court and using in the examination of some of the witnesses the gloves and the hammer was highly prejudicial. (*People* v. *Marendi,* 213 N. Y. 600; *People* v. *Nuzzo,* 294 N. Y. 227.) VI. The court erred in admitting into evidence defendant's statement. The circumstances and conditions and the evidence made the statement of defendant highly suspect if, in fact, valid at all. (*People* v. *Elmore,* 277 N. Y. 397.) VII. The Judge erred in his charge to the jury when he instructed them as to the defense of insanity. (*People* v. *Kelly,* 302 N. Y. 512; *People* v. *Sherwood,* 271 N. Y. 427.) VIII. The court failed to properly instruct the jury as to an acquittal on the grounds of insanity, and the District Attorney, in his summation, improperly misquoted the law as to a verdict of not guilty by reason of insanity, both of which were highly

prejudicial to defendant. (*People* v. *De Paulo*, 235 N. Y. 39.) IX. The court erred in failing to instruct the jury concerning the corpus delicti. X. The Trial Judge erred in that he failed to charge the jury that they could consider the question of motive or lack of motive in determining the guilt or innocence of defendant. (*People* v. *Sangamino*, 258 N. Y. 85; *People* v. *Sanducci*, 195 N. Y. 361; *People* v. *Seppi*, 221 N. Y. 62; *People* v. *Guadagnino*, 233 N. Y. 344; *People* v. *Wallach*, 217 App. Div. 527; *People* v. *Dinser*, 192 N. Y. 80.) XI. The trial court erred in not charging the jury as to the effect of character evidence. (*People* v. *Bonier*, 179 N. Y. 315; *Cancemi* v. *People*, 16 N. Y. 501; *Remsen* v. *People*, 43 N. Y. 6; *People* v. *Elliott*, 163 N. Y. 11.) XII. The Trial Judge erred in his instructions to the jury in that he did not tell the jury that they were required to bring in an acquittal for defendant in the case of a reasonable doubt whether his guilt is satisfactorily shown. (*People* v. *Stephenson*, 11 Misc. 141; *People* v. *Rafkind*, 254 App. Div. 742; *People* v. *Radcliffe*, 232 N. Y. 249.) XIII. The fact that counsel for defendant did not take exceptions to certain matters in the course of the trial or to the charge of the court makes no difference. (*People* v. *Caruso*, 246 N. Y. 437; *People* v. *Creasy*, 236 N. Y. 205.) XIV. The court erred in that it did not instruct the jury as to all matters of law which were necessary for their information in giving their verdict. (*Fitzgerrold* v. *People*, 37 N. Y. 413; *People* v. *Fanning*, 131 N. Y. 659; *People* v. *Fitz-Gerald*, 195 N. Y. 153; *People* v. *Cohen*, 243 App. Div. 245; *People* v. *Odell*, 230 N. Y. 481; *People* v. *Sobieskoda*, 235 N. Y. 411; *People* v. *Montesanto*, 236 N. Y. 396.) XV. The summation of the District Attorney was inflammatory and highly prejudicial to defendant. XVI. The court's charge was inadequate. (*People* v. *Sobieskoda*, 235 N. Y. 411; *People* v. *Montesanto*, 236 N. Y. 396.)

*Ralph S. Cramer, District Attorney,* for respondent. I. The evidence of defendant's guilt was so clear, certain and complete that the jury had no basis for any other verdict than that of murder in the first degree. II. The various rulings of the court on objections made during the examination of witnesses were proper and correct. No constitutional or statutory right of defendant was invaded. (*People* v. *Schuyler*, 106 N. Y. 298; *People* v. *Austin*, 199 N. Y. 446.) III. No error was committed

in permitting the admission of the testimony of Dr. Cohen and Dr. Schwarz. (*People* v. *Sliney,* 137 N. Y. 570; *People* v. *Koerner,* 154 N. Y. 355; *People* v. *Austin,* 199 N. Y. 446; *People* v. *Schuyler,* 106 N. Y. 298.) IV. The trial court allowed counsel for defendant full latitude in establishing facts. Only clearly objectionable matters were ruled out. V. No error exists on exhibits for identification. VI. No error was committed by the trial court in admitting the confession of defendant. Moreover, it was eminently proper for the court to refrain from commenting upon the confession under the circumstances. (*People* v. *Elmore,* 277 N. Y. 397; *People* v. *Meyer,* 162 N. Y. 357.) VII. The instructions of the court were clear, explicit and thorough as to the defense of insanity. (*People* v. *Kelly,* 302 N. Y. 512.) VIII. The court twice properly instructed the jury as to an acquittal on the grounds of insanity. There was no misquote by the District Attorney on the law with respect to a verdict of not guilty by reason of insanity. (*People* v. *Draper,* 304 N. Y. 799.) IX. There was no question of corpus delicti involved in this case. Death by criminal agency was uncontroverted and was affirmatively established beyond any doubt whatsoever. (*People* v. *Cuozzo,* 292 N. Y. 85; *People* v. *De Paulo,* 235 N. Y. 39; *People* v. *Rice,* 159 N. Y. 400; *People* v. *Thorn,* 156 N. Y. 286.) X. No error was committed in omitting a specific charge on the question of motive and such a charge could only have reacted to the detriment of defendant under the evidence in the case. (*People* v. *Sangamino,* 258 N. Y. 85; *People* v. *Rice,* 159 N. Y. 400; *People* v. *Thorn,* 156 N. Y. 286.) XI. No charge on character evidence was necessary under the record in this case and none was requested. (*People* v. *Bonier,* 179 N. Y. 315; *State* v. *Murphy,* 118 Mo. 7; *People* v. *Murch,* 263 N. Y. 285; *People* v. *Brasch,* 193 N. Y. 46; *People* v. *Odell,* 230 N. Y. 481; *People* v. *Sarzano,* 212 N. Y. 231; *People* v. *Radcliffe,* 232 N. Y. 249.) XII. The court's charge was clear and wholly adequate on the state of the record. (*People* v. *Pallister,* 138 N. Y. 601.) XIII. The failure of defendant to make objections and take exceptions or to make requests with respect to the charge of the court precludes consideration of those matters under the evidence in this case. (*People* v. *Driscoll,* 107 N. Y. 414; *People* v. *Lyons,* 110 N. Y. 618; *People* v. *Rice,* 159 N. Y. 400.) XIV. Under the clear and uncontroverted proof in this case,

the court fully instructed the jury as to all matters of law which were necessary for their information in reaching a verdict. XV. There was nothing prejudicial about the remarks of the District Attorney with respect to the boat register. XVI. The court's charge was entirely adequate to advise the jury on all matters of law necessary for their information in arriving at a verdict on the evidence in this case. (*People* v. *Odell,* 230 N. Y. 481; *People* v. *Taylor,* 138 N. Y. 398.)

Lewis, Ch. J. At 4:30 in the morning of May 24, 1953, while Mr. and Mrs. Ray E. Horton were asleep at their home in the Town of Southport, Chemung County, New York, she was awakened by a cry from her husband — " There is a knife in me; put the light on." Failing to convince him that he was dreaming, Mrs. Horton turned on the light and observed him making an effort to raise himself from the bed with his right hand " twisted " behind his back. When, during that effort, she noticed he had slumped back and her closer observation had disclosed that his night clothing bore bloodstains and that a knife lay near his back, Mrs. Horton, by telephone, summoned local medical aid and notified the Sheriff's office.

Ray E. Horton, while asleep, had suffered a stab wound in the back from which death resulted within an hour after his condition was discovered. His son, Norman, the defendant-appellant, now stands convicted of murder in the first degree upon an indictment which charged that " * * * Norman L. Horton, in the Town of Southport, County of Chemung and State of New York, on or about the 24th day of May, 1953, willfully feloniously and of malice aforethought and from a deliberate and premeditated design to effect the death of Ray E. Horton, struck and killed Ray E. Horton with a knife, said act not being justifiable or excusable."

At the trial of the indictment there was no proof that at the hour of the crime the defendant had been seen at or near his home; nor was there evidence of fingerprints which proved his presence there. There was evidence, however, that he had been seen at the college he was then attending — sixty miles from his home — at about 6:30 in the evening preceding the crime, and that he was seen again in one of the college dormitories at about 7:00 on the following morning of May 24th, the day of the crime. Proof of what had occupied defendant's time during the interval

thus unaccounted for — between 6:30 in the evening of May 23d and about 7:00 on the morning of May 24th — and of what the defendant ascribes as the reason for his return to his home during the interval of hours last mentioned above, appears of record in a detailed statement made by the defendant on June 27, 1953, at a place and in circumstances presently to be described. In abbreviated form that statement is as follows:

At the time of the crime the defendant, then eighteen years of age, was about to complete his first year at college. The college year then drawing to a close had not been for him in any sense a success. His hope for fraternity membership had not been fulfilled; the friendships he had made in a few instances, and certain forms of misbehavior in which he had engaged and which he recognized as wrong, were not conducive to his being well regarded in the student body; his scholastic standing was at no time of a grade satisfactory to his father who did not withhold expressions of his disappointment in the young man — a continuation of an attitude amounting almost to scorn which the father had shown toward his son over a period of years. Thus it came about that on May 23, 1953, four days before the year's final examinations, for which he was unprepared, the defendant was in a state of complete frustration — lonely, discouraged, with an attitude toward his father which through the years of misunderstanding between them had grown to deep hatred and in addition had finally led the son to regard his father as accountable for the plight in which he found himself. Baffled by the adverse circumstances then affecting him, and convinced that his father was accountable for his major failures, he concluded the best solution of his problem was to take his father's life, and thus make it possible for him to reside with his mother, for whom he had a deep affection. With that project in mind and having been offered transportation in the car of an acquaintance, he left the college campus and reached the vicinity of his home about 10:30 on the night of Saturday, May 23d. After finding in his father's garage a hammer and a pair of gloves — the gloves being necessary " * * * because I knew they would be looking for fingerprints " — he waited several hours until the light was out in his parents' bedroom and the time arrived when the noise and whistle of a train due to pass nearby would muffle any noise he happened to make. When the train

whistle sounded — having previously removed his shoes — he entered the living room of the house by first forcing an outside French door and bracing it open with a white stone; then, with the hammer, he broke a lower pane in the inside French door and displaced enough glass to permit him to insert his hand, release the bolt and other door fastenings and to move back a davenport which stood inside against the door. Having thus effected an entrance, he seated himself in the living room for a period of about half an hour where he " just sat and thought " and warmed himself after the chilling hours he had spent outside. He then went into the kitchen where he withdrew a knife from a box containing a carving set and slowly mounted the stairs leading to his parents' room. Upon opening the door and making his way carefully to his parents' bedside, he stopped momentarily sensing that he was shaking " \* \* \* probably from fear ". According to his statement " I kept telling myself, ' You have got to do it. It is the only way out. It isn't right but it is just circumstances that led me there and there is no way out.' " He then advanced to a position close to his father where, after another delay due to fright, he thrust the knife deep into his father's back inflicting the wound which caused the latter's death. The defendant then hurriedly left the bedroom, returning first to the kitchen where he restored the knife box to the place where it belonged, then to the dining room where he replaced a card table which had been moved. He then left the house by the door through which he had entered, retrieving the hammer he had used and his shoes as he fled. While " hitch-hiking " his devious way back to the college campus he disposed of the gloves he had worn by throwing them into a field; the hammer he had used he threw into a creek.

Arriving at his dormitory room between 6:00 and 7:00 in the morning of May 24th, he had been there only a short time when there was relayed to him a telephone message informing him of his father's death without mentioning the cause. Later in the day, while he was returning to his home with three friends of his family — who assumed his father's death had been due to a heart attack — the defendant expressed to them surprise because, as he said, his father " didn't have a heart condition ".

For a period of days after he returned home, the defendant was repeatedly questioned by State Police and members of the Dis-

trict Attorney's staff and on each occasion he denied complicity in, or knowledge of, the crime which had taken his father's life. There came a time, however, when, after a finding by two physicians — licensed examiners in lunacy — that he was noncommitable to a State hospital, the defendant, with the consent of his mother and upon his own consent, was admitted at the Binghamton State Hospital as a volunteer patient. While there he revealed to another voluntary patient with whom he had become acquainted, some of the details of his father's death. That revelation later came to the attention of the hospital authorities and to the District Attorney and led eventually to the occasion on June 27, 1953, when, in the presence of a Supreme Court reporter, the District Attorney and counsel for the defendant, he made the statement to which reference has already been made.

Following the defendant's arraignment upon the indictment and his plea thereto of " Not guilty, and not guilty by reason of insanity ", there was conducted, pursuant to court order and in accord with sections 658–662 of the Code of Criminal Procedure, an examination of the defendant by two psychiatrists, qualified as defined in the Mental Hygiene Law, to determine whether he was in such a state of insanity as to be incapable of understanding the charge made against him in the indictment, or of making his defense thereto. Thereafter a hearing was held by direction of the Trial Justice, pursuant to section 662-a id., at which hearing counsel for the defendant was afforded an opportunity to controvert findings of the examining psychiatrists and to examine them in reference thereto. Thereupon, in accord with the report of the examining psychiatrists, the court found that the defendant was not in such a state of insanity as to be incapable of understanding the charge in the indictment, or of making his defense thereto.

Although it is argued on behalf of the defendant that there is no evidentiary basis in the record which justified a finding by the jury beyond a reasonable doubt that it was the defendant who inflicted the stab wound which caused his father's death, our review of the facts — which we are permitted to do in a capital case (N. Y. Const., art. VI, § 7; *People* v. *Crum,* 272 N. Y. 348, 349–350) — leaves us in no doubt that the jury was justified in finding that the killing was the act of the defendant. There remains for determination the question — which was practically

the only issue at the trial — whether the jury was justified in finding, as its verdict implies, that at the time of the homicide the defendant, in a legal sense, was mentally responsible for his act.

Mindful that no act is deemed criminal or punishable in this State unless prescribed or authorized by statute (Penal Law, § 22), we turn to section 1120 of the Penal Law which prescribes in part that: " A person is not excused from criminal liability as an idiot, imbecile, lunatic, or insane person, except upon proof that, at the time of committing the alleged criminal act, he was laboring under such a defect of reason as: 1. Not to know the nature and quality of the act he was doing; or 2. Not to know that the act was wrong."

As to the burden cast by that statute upon the prosecution, we have recently said (per CONWAY, J.): " When the defense of insanity is raised under section 1120 of the Penal Law, the People must establish on the whole case beyond a reasonable doubt *both* that the defendant knew the nature and quality of his act *and* that he knew the act was wrong. To put it in another and converse manner, the defendant is entitled to acquittal if the jury find *either* that he did not know the nature and quality of his act *or* that the act was wrong." (*People* v. *Kelly,* 302 N. Y. 512, 515; italics in original text.) Guided by that analysis of the statutory pattern prescribed by section 1120, we turn to the record before us of proof interposed at the trial to determine whether, when the entire evidence is considered, the prosecution established beyond a reasonable doubt that, at the time the crime was committed, the defendant knew the nature and quality of his act, and knew that the act was wrong.

Prior to introducing in evidence the defendant's statement made on June 27, 1953 — to which reference has already been made — the prosecution called witnesses whose testimony established without contradiction that at about 4:50 in the morning of May 24, 1953, Ray E. Horton died as the result of a deep stab wound in his back which had severed the victim's liver and had caused profuse internal hemorrhage; that a carving knife — one of the items in a carving set kept in a wooden box in the Horton home — was found near the victim's body; that there was no evidence that a struggle had taken place in which the victim was involved; that a white stone was found bracing

open the left-hand outside French door leading into the living room; that a lower window pane in one of the inside French doors had been broken, a portion of the glass had been removed and a curtain which hung on the inside of the door had been pierced and torn; that a davenport which had stood with its back against the French doors had been moved so that it stood at an angle with one end out in the room away from the door. The People also proved without contradiction that the defendant had been seen in one of the dormitories of the college he was attending at about 6:30 on the evening of May 23d and again on the following morning of May 24th, the day of the homicide. The prosecution then put in evidence the defendant's statement, made on June 27, 1953, which contained not only facts which were in complete coincidence with those already proven by the People's evidence but in addition facts which served to bring into the record in narrative form for consideration by the jury a running account of the defendant's connection with his father's death and the circumstances claimed by him to have brought it about.

The defendant did not take the stand as a witness in his own defense but called numerous character witnesses by whom the jury was told that, based upon the speech of people in the community in which he lived, the defendant was a well-mannered youth, reserved, and quiet; that although his scholarship in grammar school was good, it deteriorated when he reached the junior year in high school; that his deportment and "reputation for peace and quiet" were excellent. It also appears of record that, although the defendant graduated from high school, his scholarship in college did not meet the required grades.

In support of his defense of insanity, evidence was offered by the defendant of the following episodes, among others, which it is claimed afforded proof that at or about the time of the homicide his mind was disordered. One incident — mentioned by the defendant in his statement of June 27, 1953 — occurred at college a few days prior to the final examinations for his first year and at a time when, as he described it, "I was so far behind in my work and I had just become slack and put things off. Well, I just wasn't doing what I should and so I just kept thinking 'How am I going to get out of it?' Of course, all this time this hate and feeling, 'Well, whose fault

is it anyway that I am here?' kept building up and I realized it was my father's fault." While thus concerned with his predicament he suffered a stomach disorder which he ascribed to the following cause: " I think maybe it was a temper tantrum, that feeling of hate and the feeling of resentment and jealousy and everything else and I was conscious of what I was doing. Well, I was in bed and I couldn't sleep. I was so uncomfortable and I took the beer mug on my desk and threw it against the wall. Well, I guess it just let out emotion that I had built up inside of me and I went over to my closet and took the glasses out and started throwing them against the wall and I really think I was throwing at my father because it was his fault."

There was also testimony from a witness who had called upon the defendant and his mother at the Horton home before the funeral of the defendant's father. On that occasion the defendant led the witness into the room where his father's body lay in a casket. After commenting on the display of flowers, the defendant walked over to a piano in the same room and proceeded to play classical music.

In addition, there was introduced in behalf of the defendant testimony by a psychologist who in the month of October, 1953, had subjected him to certain psychometric examinations from which the witness concluded that the defendant at the time of those examinations was in a state of intellectual deterioration. The defense also called two physicians who had specialized in psychiatry, each of whom had examined the defendant and had read his statement of June 27, 1953. Based upon such examinations and upon facts of record recited in a hypothetical question, each witness testified that at the time of the homicide on May 24, 1953, the defendant was in such a mental state that he did not know the nature and quality of the act he then committed and did not know that it was wrong.

When the defense had rested its case, the prosecution called a clinical psychologist who in December, 1953, had subjected the defendant to certain psychological tests which showed him to be a " narcissistic ", viz., a person given to emotional outbursts when his needs are denied. The prosecution also called two physicians who had specialized in psychiatry, each of whom had examined the defendant and had read the statement made by the defendant on June 27, 1953. In answer to a hypothetical

question which recited details of the crime and related matters, each witness gave his opinion to be that, on May 24, 1953, at the time of the killing of Raymond E. Horton, the defendant knew the nature and quality of his act and knew that it was wrong.

Thus did it come about that when the evidence was closed the issue of the defendant's sanity had become the chief issue and, as a clear question of fact, was a proper subject for determination by the jury. As to the scope of our consideration of the jury's verdict, if the record in its entirety presents a fair conflict in the evidence, or if conflicting inferences can properly be drawn from it, '' * * * the determination of the jury will not be interfered with, unless it is clearly against the weight of evidence, or appears to have been influenced by passion, prejudice, mistake or corruption.'' (*People* v. *Taylor,* 138 N. Y. 398, 405.) The defendant cannot be excused from criminal liability because at the time of the killing his mind may have been disordered to a degree less than that which is fixed by section 1120 of the Penal Law. '' A weak or even a disordered mind is not excused from the consequences of crime ''. (*People* v. *Farmer,* 194 N. Y. 251, 265.) Under section 1120 of the Penal Law, as we have seen, the defendant was entitled to an acquittal only in the event the jury found either that, at the time he committed the act with which he is charged, he did not know the nature and quality of his act or that the act was wrong. Applying that statutory formula to the defendant's evidence, we think that evidence falls short of exculpating him. His conduct immediately before the killing was not that of a man in frenzied haste; the crime was carefully planned by him alone and was executed deliberately in exact accord with that plan. Upon arriving at his home before his parents had retired for the night, he waited not only until their room had been darkened, but for a period of time thereafter until the noise of a passing train and the sound of its whistle would muffle any noise he might make in forcing his entry into the house. When he had accomplished an entrance into the living room, in the manner already mentioned, he did not go hurriedly about his baneful project, he '' just sat and thought ''; when he had gone slowly up the stairs to his parents' bedroom armed with a long-bladed knife and had reached his father's side, he paused two times —

the first because he was shaking, as to which pause his statement tells us " I had this urge. It was something I kept telling myself, ' You have got to do it. It is the only way out. It isn't right, but it is just circumstances that led me there and there is no way out.' And I really did think about it." He then stepped over to the bed and, as he raised the knife, a final pause occurred, which his statement describes as follows: " I wanted to bring it down, but my body wouldn't let me. I mean I just didn't have the will power or I don't know what you would call it, but I just couldn't bring myself to do it. By this time I was just scared to death. I mean I just didn't know what to do. I mean I was scared. Well, there was just no way out and so I tried it again and I took the knife and I just put it in my father's back and the feelings were just going on."

As apposite to the problem presented by this record, we quote a statement made for this court more than fifty years ago (per MAYNARD, J.) : " Eminent alienists criticise the rule of the Penal Code, because it excludes consideration of the question, whether the accused possessed sufficient power of self-restraint to forbear the commission of an act, which he clearly perceived to be criminal. They contend that it is unreasonable and unjust to punish a human being for that which he does not have the power to refrain from doing, but if such a result may follow, which we by no means admit, it is an argument to be addressed to the body which makes the law, and not to the tribunal whose sole duty it is to construe, apply and enforce it." (*People* v. *Taylor, supra,* pp. 407–408.)

Having read and considered with care the evidence of record, and having reached the conclusion that it affords no basis for our interference with the jury's verdict, we pass to a consideration of the defendant's challenge to certain evidentiary rulings by the Trial Justice and to the legal sufficiency of his charge to the jury.

During the cross-examination of one of the psychiatrists called as an expert by the defendant, the witness testified without objection that the defendant was a schizophrenic; that his behavior when he stabbed his father and during prior acts incidental thereto was his response to a delusional process and that such delusional motivation made him psychotic and " incompetent of knowing what he was doing." The same witness, on

direct examination, had stated his opinion to be that at the time of the homicide the defendant was " incapable of distinguishing a right from wrong ", and later, on cross-examination, he stated his opinion to be that the defendant did not know that certain acts incidental to the stabbing of his father were wrong. In the course of the same cross-examination, repeated questions were also asked as to whether the defendant knew what he was doing when he did certain acts — which the expert termed " psychotic episodes " — leading up to the homicide. When the witness answered " no " and added either a qualifying phrase or sentence, the answer, except for the word " no ", was stricken by the Trial Justice upon motion by the District Attorney. We do not think those rulings served in effect to leave with the jury — as is now claimed — an instruction that it was immaterial whether the defendant perpetrated this homicide in response to a delusional idea, and that his counsel's theory on the subject of insanity was either incredible or irrelevant. The record shows, as pointed out above, that the witness had previously been permitted to testify, without objection, that in his opinion the defendant was a schizophrenic whose behavior — when he stabbed his father — was his response to a delusional motivation which made him psychotic and incompetent of knowing what he was doing. With that clear statement in the record of the witness' opinion — supplementing, as it did, his stated opinion that the defendant did not know that his acts incidental to the homicide were wrong — we think the challenged rulings were well within the discretion of the Trial Justice and did not prejudice the defendant's rights.

As to the assertion that in his charge to the jury the Trial Justice should have commented upon the evidence bearing upon the defense of insanity, we have in mind the fact that the case was submitted to the jury after seven days of testimony. The theory of insanity upon which the defense was based had been repeatedly the subject of questions propounded by counsel and answers given by experts in psychology and psychiatry called in behalf of the defendant and by the People. Believing, as we do, that at the close of the evidence the jury had been thoroughly informed of the theory of insanity upon which the defense was based and the relation of that theory to evidence descriptive of the crime, we conclude that in the circumstances disclosed by

this record the failure of the Trial Justice to make further reference to the evidence was not reversible error requiring a new trial.

It is also argued in behalf of the defendant that an error of substance, which was prejudicial to his rights before the jury, was made by the Trial Justice when, after reading correctly to the jury the text of section 1120 of the Penal Law, and on three subsequent occasions making a correct contextual application of its provisions, there came a time when the court stated: '' Individuals of inferior intellect with depraved minds, individuals have morbid propensities to commit acts and whose mentality is low and unstable, are none the less answerable for their crimes if they have sufficient mental powers to know the nature and quality of the act or to know that the act was wrong.'' Obviously, the use in that context of the disjunctive '' or '' instead of the conjunctive '' and '' was wrong. The record shows that when, at the end of his charge, the Trial Justice was apprised by counsel of his erroneous use in one instance of the disjunctive '' or '' he sensed his inadvertence and was quick to give the following clear admonition to the jury: '' The Court: If I made such a mistake, I was wrong. The People must prove beyond a reasonable doubt both that the defendant knew the nature and quality of his act and he knew that it was wrong. If he didn't know the nature and quality of his act your verdict must be not guilty by reason of insanity, or if he didn't know it was wrong. The statute reads ' or.' It isn't ' and.' '' It is difficult to conceive of a clearer statement, or one more perfectly designed to set aright any misunderstanding which any juror might have gained from the misuse of one word in the original charge.

The circumstances here differ in an important respect from those in *People* v. *Kelly* (302 N. Y. 512, *supra*) and *People* v. *Sherwood* (271 N. Y. 427), where no admonition in such clear and unmistakable language, as is to be found in the present record, was given to the jury.

In addition to the rulings by the Trial Justice now challenged by the defendant, to which reference has already been made, we have considered with care all other matters to which the briefs of counsel direct our attention. Our conclusion is that the record contains no errors which so adversely affect the

substantial rights of the defendant as to warrant reversal of the judgment herein and a new trial.

Accordingly, the judgment of conviction should be affirmed.

VAN VOORHIS, J. (dissenting). A new trial should be granted, in my view, on account of rulings upon the admission of evidence and the charge to the jury in relation to the defense of insanity.

Appellant has been found guilty of murdering his father by stabbing him while sleeping at his home on May 24, 1953. At this time appellant was a freshman in college, eighteen years of age. Ample character evidence establishes that he was not the callous type of juvenile delinquent, coarse and indifferent to human life, but that he was a sensitive and mannerly youth, aware of the rights and feelings of other people. Beginning with the end of high school, he had undergone personality deterioration. His grades, which were average during the earlier half of his high school course, fell in his junior year at high school and reached a point where he was unable to meet the scholastic requirements at college. His intelligence quotient dropped from 108 to 81, he became moody, withdrew from social contacts and developed homosexual practices. One of his high school teachers noticed extended periods during which he would sit in revery with a silly, shallow smile upon his face. In his relationships with his father, there was more than misunderstanding. Given to introspection, he came to blame his father for all of his own shortcomings and frustrations. While at the Binghamton State Hospital for observation after the homicide, he made a fifty-six-page confession, as accurate, it seems to me, in depicting his inner consciousness as it was proved to have been in narrating the details of the homicide. The demonstrated accuracy of this lengthy statement has counted heavily against appellant, both in connecting him with the homicide and in defeating his defense of insanity. It does connect him with the homicide and indicates that he had not lost the power of consecutive thought, yet the mental and emotional condition which it discloses may seriously be questioned to have been that of a sane man. In this statement or confession, he blamed his father for failure in his studies, for failure to make a fraternity in college, and for being homosexual; he stated when he attempted to relieve his nervous indigestion by throwing a beer mug at the

wall in his room at college, " I really think I was throwing at my father because it was his fault. Well, the stomach-ache stopped after I had done that and there had been quite a commotion caused I guess. * * * I thought, ' Well, if my father was dead, I would not have to take the exams and everything would be all right. I would have my mother's love and we would live happily ever after.' I mean I got thinking and I got to thinking what I wanted to do and I just thought it was the best solution." In the course of this statement, he said of his father " ' Well, it is his fault and I am paying the consequences. It is through his fault that I don't have any money; that I am homosexual, and just everything.' " This statement was made after the homicide, and when the seriousness of it had been borne in upon him as much as he was capable of understanding, yet he added: " Maybe it wasn't a fair accusation but I think it was." Although at times he seemed depressed, there are passages in this confession where appellant exulted in his accomplishment, saying: " But after this has happened, I feel very sincerely that it is all passed and, as I say, I have never wanted to live so much and to make more of myself than now and, to tell you the honest truth, I have never felt better."

The defense psychiatrists stressed this inappropriateness of emotions to the subject matter in his mind. They testified that lack of memory and intellectual disorientation are not necessarily involved in schizophrenia, but that when the emotions and the intellect run at cross purposes, it is an indication of serious mental disorder. This is on a plane with the lay observation of a newspaper man who testified that the way in which defendant played the piano at the family home while his father lay in the casket impressed him as irrational, and the testimony of a fellow high school student, who was there during the same night, that the defendant was constantly engaged in irrelevant flippancies.

The Binghamton State Hospital records show that he was diagnosed as a psychopathic personality, although without psychosis. One of the People's psychiatrists, Dr. Harry A. Steckel, stated: The boy suffers from " psychopathic personality "; in him " There is absence of emotional and volitional control. There is poor judgment and inability to profit by experience; that in a general way is the background upon which the behavior

of the psychopath depends." He testified that this does not mean that appellant is psychotic, but that he has psychotic episodes, "episodes of excitement, episodes of confusion". Dr. Steckel further said that "A psychosis exists only when the individual has no insight and when he is out of touch with reality. That is to say, when he is unable to relate himself to reality and has no insight as to his behavior, we can then say that we are in the psychotic field, but the psychopath without psychosis [i.e., the appellant] remembers his acts. He is able to describe them, he knows what has happened, and he knows that it's wrong, *but is a reasonable act according to his judgment.*" (Italics supplied.) This was a concession, by an expert testifying for the prosecution, that killing his father was a reasonable act according to appellant's judgment.

The other People's psychiatrist, Dr. Hugh S. Gregory, admitted that appellant was a "psychopathic personality", adding " That diagnosis does not constitute insanity ", but testified that neither does it constitute " normalcy." Although both of these People's experts testified that in their opinions appellant knew the nature and quality of his act and knew that it was wrong, their testimony indicates the probability of mental disease.

Appellant's psychiatrists testified that appellant had a definite psychosis in that he suffered from schizophrenia, which is the modern name for dementia praecox. Dr. Irving Handin testified that at the time of the homicide appellant was " psychotic insane and his reason, or his ability to reason was so disturbed that he could not know the difference between right and wrong." He said: " We have the hebephrenic type with the silly smile, this air of detachment. You have elements of paranoid schizophrenia, this projection of his own hate so it seemed to be reflected from his father, and he received the impression ' my father hates me; he doesn't love me; he will do anything to harm me.' This is mental distortion. Then there is the catatonic element, this rage reaction he had in college where he would smash up china crockery so it would disturb the whole dormitory. This was a psychotic reaction he had here that we find in catatonics. So we had a mixture of three types." On cross-examination, Dr. Handin conceded that appellant was not mentally disoriented in the sense that he lacked ability to plan the homicide and his escape, but testified: " When I spoke of detach-

ment from the reality, a schizophrenic patient can intellectually be aware that something is wrong but emotionally it does not have the same consideration of wrongness to it. He can go ahead plan a crime, commit it, and after committing it, he [*sic*] hasn't the same meaning for him as for you and me. * * * The concept of wrongness doesn't enter here, as far as we have gone; just a matter of being caught, not whether it is wrong or right.'' The veracity of that conclusion is confirmed by the statement made by appellant at the Binghamton State Hospital, not by his deliberate or purposeful affirmation, but indirectly and subtly by subconscious innuendo which makes it the more convincing.

The main problem on this appeal is whether mental disease of this nature is relevant to the legal defense of insanity. A similar question has arisen in various forms since the test of whether the defendant knew that the act was wrong (Penal Law, § 1120) was proclaimed and reaffirmed in 1843 in *M'Naghten's Case* (10 Cl. & Fin. 200). So little did the conception of mental illness enter into that definition, as it was originally conceived and applied, that nineteen years after *M'Naghten's Case,* the Lord Chancellor of England allowed himself to state that '' the introduction of medical opinions and medical theories into this subject [the criminal law] has proceeded upon the vicious principle of considering insanity as a disease ''. (165 Hansard's Debates, 3d series, 1297, quoted in Overholser: '' Psychiatric Expert Testimony in Criminal Cases Since M'Naghten '', 42 Journal of Criminal Law, Criminology and Police Science, 283, 284.) The development of psychiatry appears to have transferred the main professional attention from disorganization of the intellect to emotional disturbances. The legal definition remains focused upon intellectual disorientation, that is to say, upon whether a defendant has recognized in his mind that the act was contrary to law and to accepted standards of morality, regardless of how distorted his own standards of behavior may have been due to emotional disintegration. It is now settled, however, that mental disease is relevant and necessary in order to establish the legal defense of insanity, by showing that mental disease has been the cause of impairment of a defendant's *intellectual* faculties to an extent such that he failed to understand the nature and quality of his act or to know that it was wrong (*People* v. *Schmidt,* 216 N. Y. 324).

Whether error is presented by rulings of the trial court in the instant case depends upon whether the jury should have been permitted to take into consideration the theory of fact advanced by appellant's psychiatrists, namely, that his mental processes were disrupted by insane delusions of persecution by his father, to such an extent that he did not know his act to be wrong, that is to say, that his motivation stemmed from a deep-seated but erroneous belief that it was morally right to take his father's life as the only means by which he could end the persecution and thereby save his own life and integrity as a person. In ruling upon objections by the District Attorney to testimony of Dr. Ralph Brancale, one of the psychiatrists who testified for the defense, the Trial Justice made clear to the jury that according to his ruling such defense could not be considered within the law. The testimony offered by Dr. Brancale was to the effect that appellant's act was the product of persecution by his father and that, being actuated by such a delusion, appellant did not understand that his act was wrong. He testified that, although apparently aware that he was killing his father, only " seemingly " did appellant even know what he was doing. This answer was stricken out by the trial court. The next question was: " Q. Doctor, did he know what he was doing when he committed those acts? A. The answer is no. He was psychotic at the time and did not know the nature and quality of his acts." This answer also was stricken out. In response to a similar question, the answer was: " A. No, he was in a schizophrenic state." All but " no " was stricken out. This doctor then said: " I wish to qualify my responses." In answer to the next question of similar import, the doctor said he was still responding to his delusional idea. This answer was also stricken out by the court. Finally, the doctor was compelled to answer categorically " No ". He added, however: " Your Honor, I think I should be permitted to qualify my answers on this in all fairness.

" The Court: You should answer the question." Defendant's attorney took an exception to holding the witness to a " yes " or " no " answer. A little later the District Attorney stated: " You concede, then, Doctor, that this series of connected activities seemed to be rational? A. Seemed to be rational just as the case of a paranoid praecox. They are a whole series of

connected activities, yet they are a most serious and most malig-
nant form of schizophrenia. Just the ability to rationalize
doesn't make it rational.'' This answer was stricken out and
the jury instructed to disregard it. This contest between the
court and the witness, which the Trial Justice evidently thought
to have been required by sections 34 and 1120 of the Penal Law,
lends color to the comment of Dr. G. H. Stevenson, F. R. S. C.,
at page 732 of Volume XXV of the Canadian Bar Review (1947)
that: '' The psychiatrist's difficulties with the M'Naghten Rules
begin with the administration of the oath. He is sworn to tell
the whole truth, but the rules, because of their concern only
with the intellective aspects of mental function, prevent him
from telling the whole truth about the accused's mental condi-
tion. If he attempts to tell of the disorganized emotional aspects
which may have caused the crime, he may be sharply interrupted
by the trial judge and ordered to limit his comments to insanity
as defined by the M'Naghten Rules as laid down in section 19.
He is in an impossible position — sworn to tell the whole truth
and prevented by the court from telling it.''

In ruling out this branch of Dr. Brancale's testimony upon
the ground that it was immaterial whether appellant perpe-
trated this homicide in response to this delusional idea, the trial
court thereby instructed the jury, in effect, that appellant's
counsel's theory of fact on the subject of insanity was either
incredible or irrelevant. This error went uncorrected when it
came to the charge. No details of the evidence were cited in
the charge to aid the jury in applying the law to the facts. The
trial court contented itself with instructing the jury concerning
what constitutes insanity in the language of sections 34 and
1120 of the Penal Law, adding merely that to know that an act
is wrong under section 1120, a defendant must know that it is
contrary to law and to the accepted standards of morality. No
reference was made to any of the evidence in the record, nor
was mention made of the theory or basis of insanity advanced
in behalf of appellant. Omission to comment upon any of the
evidence respecting this complicated question of insanity, con-
stituted error under the principle thus stated in *People* v. *Odell*
(230 N. Y. 481, 488, 494): '' The better practice for the court in
a criminal case, emphatically in a capital case, even when unin-
vited by the defendant, is to present to the jury the case on

trial in all the phases in which the jury ought to consider it. (*People* v. *Fanning,* 131 N. Y. 659, 663.) Much latitude must be allowed in the application of this precept, but to charge in such a case as this without adverting in any respect to the testimony might result in harmful prejudice. The trial judge should not as a rule limit himself to stating good set terms of law culled from the codes and the reports. Jurors need not legal definitions merely. They require proper instructions as to the method of applying such definitions after reaching their conclusions on the facts.'' To similar effect are *People* v. *Becker* (210 N. Y. 274, 307); *People* v. *Sobieskoda* (235 N. Y. 411); *People* v. *Montesanto* (236 N. Y. 396).

The jury were left with the understanding, so forcibly inculcated in them during Dr. Brancale's testimony, that even if appellant acted from delusions of persecution by his father, that would of necessity be immaterial in deciding whether he knew that what he did was wrong.

This court has felt the need to integrate into the criminal definition of insanity in some manner the existence of delusions (see the discussion of Lord ERSKINE's defense in *Hadfield's Case,* 27 How. St. Tr. 1282, in the year 1800, in Weihofen: Mental Disorder as a Criminal Defense, pp. 56, 105–106), although in this State their relevance has been limited to whether the homicide was the product of a delusion of such nature as to obscure the defendant's knowledge of right and wrong (*People* v. *Taylor,* 138 N. Y. 398; *People* v. *Ferraro,* 161 N. Y. 365, 378; *People* v. *Sherwood,* 271 N. Y. 427, 430). In *People* v. *Sherwood* (*supra,* p. 430) the court said: '' The claim of the defense was that the mother killed the child because she had become obsessed with a delusion that in death alone could there be safety and freedom from pain, suffering and misery for her son. The time has gone by when such a claim could seem fantastic, either to judge or juror. While we still — and rightly — accept the validity of such claims with the utmost caution, we nevertheless know now that they may be valid.'' In *People* v. *Schmidt* (216 N. Y. 324, 338, 340, *supra*), although it was recognized that the test of legal insanity must be adhered to as defined by our statutes, the court said: '' We must not, however, exaggerate the rigor of the rule by giving the word ' wrong ' a strained interpretation, at war with its broad and primary meaning, and least of

all, if in so doing, we rob the rule of all relation to the mental health and true capacity of the criminal." (P. 339.)

With his life at stake, appellant was entitled, as it seems to me, to have had the basis in the evidence for his claim of insanity explained to the jury in the charge by appropriate reference to details of the evidence, at the least, to have had the theory of insanity on which the defense was based mentioned in the charge, especially in view of the circumstance that it had been discredited by the remarks of the trial court while Dr. Brancale was testifying. The defense of insanity was based on the idea that, although appellant may have known that what he did was punishable by law, nevertheless, in his inner consciousness he considered that what he did was not wrong, but justifiable due to mental derangement produced by delusions of persecution by his father which were symptomatic of mental disease. The jury were not bound to uphold this defense, but they could not consider nor weigh it unless it were presented to them, especially after they had been given to understand during the trial that it was irrelevant.

The defense of insanity as advanced by appellant's experts falls within the legal definition expressed in sections 34 and 1120 of the Penal Law, which has previously been considered. As the record stands, this defense was not adequately presented to the jury and therefore they should not be regarded as having passed upon it. As was said in *People* v. *Sherwood* (*supra,* p. 432): " It was of the utmost importance, therefore, that the law as respects criminal responsibility under section 1120 of the Penal Law, should have been made clear to the jury."

The conviction of appellant of murder in the first degree should be reversed and a new trial should be granted.

CONWAY, DESMOND, DYE, FULD and FROESSEL, JJ., concur with LEWIS, Ch. J.; VAN VOORHIS, J., dissents in an opinion and votes to reverse and to grant a new trial.

Judgment of conviction affirmed.