■ The People of the State of New York, Respondent, v Larry Robert Levan, Appellant. — Appeal from a judgment of the County Court of Cortland County (Mullen, J.), rendered May 16, 1980, upon a verdict convicting defendant of two counts of the crime of murder in the second degree. On this appeal, defendant, a 32-year-old resident of Pottstown, Pennsylvania, claims primar-

ily that by reason of schizophrenia he cannot be held legally responsible for the intentional killing of 74-year-old Walter Bliss and his 68-year-old wife, Velma, at their home in Cortland County, New York, on April 15, 1979, and consequently his convictions by the jury are against the weight of credible evidence and should be reversed. It is defendant's further contention that his mental condition precluded the taking and the introduction into evidence of his confession because he could not effectively waive his constitutional rights under *Miranda v Arizona* (384 US 436). From October 22, 1971 to November 19, 1971, and again from November 13, 1974 to April 28, 1975, defendant was hospitalized and diagnosed as suffering from schizophrenia, paranoid type, and at the time of the commission of these crimes he was on medication specifically prescribed for that condition. Although defendant had not displayed any evidence of abnormal behavior during the period he was employed as a bus driver for a child's day care center at Pottstown, Pennsylvania, from October, 1978 to April 12, 1979, on the last day of his employment it was apparent to his immediate supervisor that his behavior was irrational. He appeared nervous and upset, muttered to himself, complained of being ridiculed, and stated that he functioned seven layers above everyone else on earth. This behavior prompted his discharge. On the following day, April 13, 1979, defendant, accompanied by his wife, Vicki, left his home in Pottstown and drove into New York State, apparently without any specific destination. At about 5:00 A.M. on the morning of April 15, 1979, defendant stopped at a Howard Johnson's in Cortland County, where his ramblings of speech were described by employees and customers as strange and bizarre. At about 7:00 A.M. of that same day, which was an Easter Sunday, defendant left Route 81, on which he had been driving north, and proceeded to the Bliss farmhouse, a place he had never been before, and whose inhabitants he had never known. There, according to his confession, he asked for some water, forced his way into the house, and removing a club from a wall, brutally bludgeoned Mr. and Mrs. Bliss to death. After beating Mrs. Bliss, defendant tightly wrapped an electric cord around her neck and shoved a broom handle down her throat. Then he removed the telephone from its cradle, turned the television on to a very high volume and sped from the scene. About four hours later and some 80 miles farther north on Route 81, defendant and his wife were arrested by a New York State trooper, pursuant to a police radio transmission. At the time of his arrest, defendant was choking his wife and attempting to throw her off of the bridge on which he had stopped his vehicle. Following his arrest, he was taken to a nearby State Police substation and given his *Miranda* warnings, to which he is said to have replied, "I understand these rights. I know what I did. I don't need an attorney." He then signed a short statement prepared by the police, which admitted the basic details of the crime, but omitted his incoherent and irrelevant ramblings. At his *Huntley* hearing, the testimony revealed that defendant had received his *Miranda* warnings at least four separate times in the course of his interrogation, and that he seemed to understand his rights and waived them. There is no claim that defendant's statement was coerced or forced in any way, so in that respect it was voluntary. To show that his waiver was knowingly and intelligently made, the prosecution offered the opinions of two psychiatrists (Doctors Santa Anna and Gorti, who had previously examined defendant concerning his capacity to stand trial) that defendant possessed the mental capacity to waive his rights effectively. The contents of defendant's statement indicated an awareness of the details of the crimes and an appreciation of what he had done. In the totality of these circumstances, the finding by the trial court that the prosecution had proved defendant's statement voluntary beyond a reasonable doubt was proper *(People v Lux,* 34 AD2d 662, affd 29

NY2d 848). At trial, except in regard to his ability to waive his constitutional rights and to make a statement, defendant did not seriously contest the details of the prosecution's direct case. Rather, the defense introduced the opinions of Doctors Danehy and Reed, that because of his mental disease, defendant lacked the substantial capacity to know or to appreciate that his actions at the Bliss farm were wrong. On rebuttal, the prosecution called Dr. Kotwal, also a psychiatrist, who had examined defendant twice and had also reviewed defendant's hospital records and confession. Dr. Kotwal was of the opinion that defendant had the mental capacity to know and to appreciate the nature and consequences of his acts, and that these acts were wrong. The removal of the phone from its cradle, the turning of the television to a very high volume, the speeding from the scene, and defendant's attempt to throw his wife, who had not participated in the crimes, from the bridge, for the possible purpose of eliminating a witness, played a significant role in this doctor's opinion. The conflict between defendant's claim that he was mentally incapable of criminal responsibility and the prosecution's contention that his disease of schizophrenia did not render him legally irresponsible, was left to the decision of the jury by the trial court in a charge that was complete and in accordance with section 30.05 of the Penal Law, and to which no exception was taken. The conflicting expert testimony on the issue of defendant's mental capacity created an issue of fact for the jury to resolve *(People v Wood,* 12 NY2d 69), and in the "absence of a serious flaw in the testimony of the People's experts, the jury's finding of sanity will not be disturbed" *(People v Bell,* 64 AD2d 785). Having found defendant sane at the time of the commission of these crimes, the jury could infer the requisite intent from the totality of defendant's conduct in inflicting the serious wounds which led to the victims' deaths *(People v Horton,* 18 NY2d 355). The other contentions of defendant, which include the prosecutor's late delivery to him of some bizarre drawings that he made on the wall of his apartment after he was fired from his job; the claimed prejudicial cumulative effect of the evidence of the scene of the crimes; the improper cross-examination by the prosecution of the expert witnesses called by the defense and the prejudicial remarks of the District Attorney during summation, which were the subject of cautionary instructions by the court, have been considered and found to be lacking in merit, or, if error, then error that was inconsequential. Finally, the violent circumstances of two separate and distinct murders as related by the trial evidence herein, and for which defendant was found guilty by a jury, were ample predicate for the imposition by the trial court of two consecutive indeterminate terms of imprisonment of 25 years to life. Judgment affirmed. Mahoney, P. J., Sweeney, Kane, Casey and Mikoll, JJ., concur.