THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LUIS RODRIGUEZ, Appellant.

First Department, August 9, 1984

### APPEARANCES OF COUNSEL

*Murray E. Singer* of counsel (*William E. Hellerstein,* attorney), for appellant.

*Richard Haftel* of counsel (*Billie Manning* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

After a jury trial at which the defense was insanity, defendant Luis Rodriguez was found guilty of attempted murder in the second degree and assault in the first degree, and sentenced concurrently to the maximum terms allowable. The only issue on appeal, aside from a meritless claim of excessive sentence, is whether the prosecutor's conceded excesses in cross-examining defendant's expert witness denied defendant his right to a fair trial.

In February of 1979, one month after they met, Lillian Marrero and defendant began to live together. Although she subsequently had him arrested five or six times for

beating her, she refused to leave him because, as she explained, she "loved him and was terrified" of him. On one occasion, after a beating he told her, "If you are going to call the cops again, I am not only going to kill you, I am going to burn your mother's house. I am going to hurt your daughter, and I am going to hurt one of your sisters." Again, in June, 1980, after he had beaten her and been arrested, defendant told her, "If you call the cops on me again, I am going to kill you." After this beating and threat, Ms. Marrero left defendant and rented her own apartment.

In August, 1980, at a chance encounter, Ms. Marrero asked defendant how, after having been arrested so many times, he had managed to avoid going to jail. He told her that he would instruct his lawyer to raise an insanity defense and that it usually worked. He boasted that he could do virtually anything he wanted and avoid the consequences by pleading insanity.

At about 6:00 A.M. on September 7, 1980, while Ms. Marrero was preparing to go to her mother's house to celebrate her daughter's birthday, defendant telephoned and asked if he could come over. She told him that she did not want to see him anymore. Several hours later, however, around 11:30 A.M., he appeared at her door and forced his way into her apartment. Ms. Marrero observed that, while defendant was angry, he was not intoxicated. After she told him, as she had earlier, that she would not see him anymore, he asked her, "Do you want to be hard?" When she replied "no" he repeated, "Do you want to be hard?" Ms. Marrero then "heard the click" and saw the "shine" of defendant's knife. She screamed, "Luis, no." He stabbed her twice.

Ms. Marrero pleaded with defendant to leave her alone, but he refused. Despite her assurances to the contrary, he told her, "[Y]ou are going to tell the police." When Ms. Marrero screamed defendant took a pillow and placed it over her face, and began to stab her again, saying, "die bitch, die, you are going to die." In all, defendant stabbed Ms. Marrero 11 times during the episode, which lasted about 30 minutes. Eventually she lost consciousness.

Within minutes after receiving an emergency call, two police officers arrived at Ms. Marrero's apartment and were met at the door by defendant, who told the officers that he had stabbed his wife. Defendant, who did not appear intoxicated, ran into the kitchen and returned with an eight-inch-long bloodied knife, which he handed to the officers. Ms. Marrero, bleeding profusely and with knife wounds to her bowels, lungs and large intestines, was taken to the hospital where she underwent a five-hour life-saving operation. Two of the knife thrusts had penetrated the sternum, one extending five inches into the chest. The other had entered the pericardial sac. Ms. Marrero was hospitalized for five weeks.

After being given his *Miranda* warnings in the apartment, defendant told a detective he had been drinking heavily the night before and that he had tried to telephone Ms. Marrero, but had been unable to reach her. According to defendant, when he arrived at her apartment the next morning and Ms. Marrero told him that she did not love him anymore, he stabbed her three or four times and then put a pillow under her head to make her comfortable. Defendant made repeated inquiries as to whether Ms. Marrero was dead. Defendant repeated essentially the same account several hours later in a video taped statement to an Assistant District Attorney.

In the ensuing months defendant wrote Ms. Marrero several times. In one letter, he told her how much he loved her and begged her forgiveness. In another, he asked her to testify at his trial that he was under the influence of drugs and alcohol at the time of the incident. He concluded a third letter, "Lillian, the only favor I can ask of you is if you have a heart, have mercy on me and if you don't want to grant me amnesty, then I know where I stand because, hell, some day, if I make it through these long years that lie ahead, I'll always remember I stood alone."

The sole defense witness was Dr. Robert Goldstein, a psychiatrist, who, after interviewing defendant once and reviewing reports prepared by other doctors who had examined him, all of whom had a diagnosis different from Dr. Goldstein's, concluded that defendant had been suffering

from a psychiatric condition known as intermittent explosive disorder. According to Dr. Goldstein, defendant's knife attacks on his mother, his previous common-law wife and Ms. Marrero were a result of an inability to control his aggressive impulses when provoked, by even the most trivial of stresses. While Dr. Goldstein believed that defendant had appreciated at the time of the crime that his actions in stabbing Ms. Marrero were harmful to her, he nevertheless maintained that defendant had not wanted to kill Ms. Marrero, reasoning that if he had, he would have stabbed her more than once in the heart area. Dr. Goldstein also maintained that he had serious doubts about whether defendant was sane at the time of the attack, but he refused to state definitively that defendant was insane at the time.

The People's psychiatrist, after reviewing both defendant's post-arrest statements and Ms. Marrero's testimony, found defendant to be an antisocial person, that is, someone who knows that he is doing wrong but does it anyway. Citing, *inter alia,* defendant's statements both before and during the attack, and his efforts to minimize the crime during his video taped statement and to avoid responsibility for his actions by laying the blame on Ms. Marrero as evidence that he understood the nature and consequences of his actions, the People's expert completely discounted the theory that defendant suffered from an intermittent explosive disorder. He also found that defendant's extended history of violent behavior did not comport with the personality type — generally sedate except for isolated instances of violence — associated with the disorder. Given the circumstances of the crime and the totality of the evidence, the jury obviously had no difficulty in rejecting the insanity defense.

In asserting that he was denied due process as a result of the prosecutor's conduct in cross-examining Dr. Goldstein, defendant cites 29 separate instances in which the prosecutor resorted to ridicule and sarcasm in order to impeach the doctor's credibility, as well as his diagnosis. For example:

"DR. GOLDSTEIN: [I] did speak to the defendant at great length. I did read letters that he wrote to his common-law

wife. I did read the other records and I have no impression that he's trying to blame anybody but himself for this.

"[PROSECUTOR]: You read his words and you are telling us that he doesn't really on reflection mean what he says. Do you always diagnose people as crazy based on this type of guesswork, doctor * * *

"DR. GOLDSTEIN: Not only did I not read a threat in that, but I specifically inquired whether or not he intended any threat, and he intended no threat, nor is there any threat in that that I can see.

"[PROSECUTOR]: I am sorry, doctor, I apologize. I should have known. You asked him and he said no threat and that was good enough for you, right?"

When Dr. Goldstein would not limit himself to the yes or no answer sought by the prosecutor the following transpired:

"Q: Yes or no, doctor, isn't that true?

"A: He was a patient in the out-patient service for a period of time before that.

"Q: Doctor, is it a symptom of some form of psychosis when a man can't answer a straightforward yes or no question?"

The prosecutor responded with sarcasm to the witness' denials that his previous associations with the Legal Aid Society had biased his diagnosis in this and other cases:

"Q: How much did you make as a result of your various consultations and testimonial performances from the Legal Aid Society last year, doctor?

"[DEFENSE COUNSEL]: I object to the word 'performances.'

"THE COURT: All right, as to form.

"[DEFENSE COUNSEL]: if it is testimony it is testimony. We don't need [the prosecutor] —

"[PROSECUTOR]: We will call it testimony * * *

"A: I work for [the Legal Aid Society], yes.

"Q: And never the Bronx District Attorney's office, correct?

"A: Well, that is your fault. You know, you could hire me any time you want. I am in the phone book.

"Q: There may be a good reason we haven't \* \* \*

"DR. GOLDSTEIN: Well, I didn't do what I did for a fee from Legal Aid. I did what I did being paid by the hour for my services whether or not I reached a conclusion that pleased Legal Aid or didn't please them. I'd still be paid for my time.

"[PROSECUTOR]: It pleased Legal Aid, but if didn't fool the jury, did it, doctor?"

The prosecutor also ridiculed the manner in which Dr. Goldstein referred to defendant in his report:

"[PROSECUTOR]: Is the defendant here a pal of yours when you examined him?

"DR. GOLDSTEIN: Pal of mine?

"Q: A friend, a drinking buddy?

"A: No, he wasn't.

"Q: Is there any reason throughout the report you referred to the defendant by his first name, Luis?

"A: Is there any reason why I shouldn't?

"Q: I am asking you why you did. You are the psychiatrist. You got the psychological mind, right?"

In addition, the prosecutor attacked Dr. Goldstein *ad hominem* on various aspects of his diagnosis, including his conclusions as to whether defendant was violent or explosive, and unable to control his actions; whether he could be diagnosed as an antisocial personality; whether he was a responsible parent; and whether he was a malingerer:

"[PROSECUTOR]: You find it part of this uncontrollable act that a man might, in the middle of the stabbing with the victim screaming, go into a room and get a pillow and attempt to suffocate her?

"DR. GOLDSTEIN: I've seen cases where people have been bludgeoned, stabbed, shot, and thrown out a window in the same course of the same act.

"[PROSECUTOR]: I am sure you pronounce all the perpetrators as crazy, right \* \* \*

"DR. GOLDSTEIN: I will define [anitsocial personality] the way the American Psychiatric Association defines it, not the way you want to define it here today.

"[PROSECUTOR]: Let's hear it, doctor. Run through your routine. What does it mean?

[DEFENSE COUNSEL]: Objection * * *

"[PROSECUTOR]: [Defendant] is not negligent, he is not reckless, he is a good provider, he is stable. Maybe we should nominate him for the man of the year, how do you feel about that?

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Again, these asides are unfortunate * * *

"DR. GOLDSTEIN: * * * I mean, maybe I am not paranoid enough. You see that threat there but I am afraid I don't.

"[PROSECUTOR]: Would you say I am paranoid for that reason?

"DR. GOLDSTEIN: I would not say that.

"[PROSECUTOR]: Come on, doctor. Take your best crack * * *

"DR. GOLDSTEIN: You know, I spent some time in our correctional institutions on visits and —

"[PROSECUTOR]: I am glad you said on visits.

"DR. GOLDSTEIN: I put that in for your benefit. And I think that you know being cooped up in a place like that twenty-four hours a day can drive anybody crazy. I don't see that as any remarkable statement on his part.

"[PROSECUTOR]: Would you suggest that we open our prison doors so that none of our prisoners go crazy and send them to you?

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Sustained * * *

"[PROSECUTOR]: [Defendant] told you he tried to kill himself on a large number of occasions, right?

"DR. GOLDSTEIN: On a number of occasions, yes.

"[PROSECUTOR]: But he just can't get the hang of it. Now, doctor, isn't it a fact —

"THE COURT: Remember what I told you, all right, these little asides are unfortunate. They seem to be attended upon adversarial proceeding. Remember, the evidence is what you heard from the witness.

"[DEFENSE COUNSEL]: I don't understand — this is an adversarial proceeding. I am not doing anything. This admonition should go to [the prosecutor], distinctly or declare a mistrial. I am trying to be patient."

As these excerpts from the record graphically demonstrate, the prosecutor's petty and mean-spirited cross-examination of Dr. Goldstein, punctuated by ridicule and insult, went far beyond the realm of legitimate advocacy. It was unworthy of his office. Indeed, such conduct has no place in any courtroom. Unfortunately, the appropriate judicial response was not forthcoming, and the tantrums continued, unabated. As inexcusable as was the prosecutor's deportment, however, we do not believe that defendant was deprived of a fair trial.

Insofar as this record discloses, and defendant does not claim otherwise, the prosecutor's conduct did not prevent him from presenting his defense or fully developing his theories of insanity. Nor did the misconduct rise to a level of constitutional magnitude. Dr. Goldstein was afforded ample opportunity for lengthy narratives on his diagnosis and, by pointing to defendant's prior assaults on the police, to refute the prosecution's theory that defendant only exploded at the weak and defenseless. Neither was this a case of a prosecutor conducting an acrimonious cross-examination of a witness unable to defend himself. Dr. Goldstein, a veteran of over 100 trials, was more than equal to the task. He was able to respond in kind on occasion and turn the tables on the prosecutor. Courts recognize that gratuitous remarks directed at experts do not, in every instance, deprive a defendant of a fair trial. (See *People v Wood,* 12 NY2d 69, 77-78; see, also, *People v Levan,* 85 AD2d 779, 781.) In the final analysis, by failing to maintain an attitude of professional detachment, the prosecutor only detracted from his cause. Defense counsel was able to argue on summation that the prosecutor could muster only personal attacks on Dr. Goldstein.

Moreover, the prosecutor's invective was not aimed directly at defendant or defense counsel, or even, for that matter, the insanity defense. The prosecutor, unfortunately, allowed his confrontation with Dr. Goldstein to degenerate into a personal antagonism. It should be noted

that the court, to the extent it did respond, gave prompt and careful instructions, informing the jury that it should disregard the by-play between the prosecutor and the defense witness. We note also that defense counsel, whose inability to perceive an abridgement of a client's right to a fair trial is particularly significant, given his opportunity personally to observe the tenor and demeanor of the cross-examination from an adversarial perspective (see *People v Hernandez,* 91 AD2d 227, 229-230, revd on other grounds 59 NY2d 881), failed to request further curative instructions or move for a mistrial.* The court repeated these instructions in the main charge and it must be presumed that the jurors were able to understand and follow them. (*People v Davis,* 58 NY2d 1102, 1104.)

Finally, we note that the proof of guilt was so overwhelming that defendant does not even challenge the sufficiency of the evidence. In such circumstances, and taking into account the lack of actual prejudice to defendant as a result of the prosecutor's conduct, we conclude that the jury based its verdict on the evidence, rather than " 'passion, prejudice, mistake or corruption' " (*People v Horton,* 308 NY 1, 12, citing *People v Taylor,* 138 NY 398, 405). Thus, the verdict should be affirmed. " 'Reversal is an ill-suited remedy for prosecutorial misconduct; it does not affect the prosecutor directly, but rather imposes on society the cost of retrying an individual who was fairly convicted' ". (*People v Galloway,* 54 NY2d 396, 401, citing *United States v Modica,* 663 F2d 1173.)

Accordingly, the judgment of the Supreme Court, Bronx County (Daniel Sullivan, J.), rendered February 2, 1982 convicting defendant of attempted murder in the second degree and assault in the first degree and sentencing him to concurrent indeterminate terms of 8⅓ to 25 years and 5 to 15 years, respectively, should be affirmed.

KUPFERMAN, J. P., ASCH and MILONAS, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on February 2, 1982, unanimously affirmed.

---

* He did at one point threaten to move for a mistrial but never actually so moved.