Jasen, J.
This .appeal involves several issues raised by an insanity defense to the charge of murder in the first degree.
*133 On March 20, 1965, the defendant fed butterscotch pudding heavily laced with sleeping pills to her husband. When he had fallen asleep, she bludgeoned him to death with a hammer and stabbed him repeatedly with a kitchen knife. Following the crime, she ingested a quantity of sleeping pills, and called her cousin to say that she had killed her husband and was about to take more pills. The police officers who responded to the cousin’s call prevented .the defendant from consuming any more pills and received .several admissions from the defendant. She stated that she had killed her husband because of an extramarital affair and to provide her daughter with the proceeds of an insurance policy. The defendant was then removed to a hospital for treatment of a possible drug overdose where she again admitted that she had killed her husband because of her romantic involvement with a psychiatrist.
Indicted for murder in the first degree on March 23, 1965, defendant pleaded not guilty by reason of insanity. At her trial the admissions, which had earlier been ruled voluntary in a pretrial hearing (People v. Huntley, 15 N Y 2d 72), were received in evidence against her. On March 8, 1966, the jury found defendant guilty of murder in the first degree, and she was subsequently sentenced to imprisonment for life. The Appellate Division unanimously affirmed, without opinion.
Initially, defendant argues that the court failed to adequately charge the jury under the then-recently amended section 1120 of the former Penal Law dealing with insanity.
Prior to the amendment of section 1120 of the former Penal Law in 1965, the standard of criminal responsibility in this State was the M’Naghten Rule, which provided that a criminal would not be excused from criminal liability as an insane person unless “ at the time of committing the alleged criminal act, he was laboring under such a defect of reason, as either (1) Not to know the nature and quality of the act he was doing; or (2) Not to know that the act was wrong.” (L. 1881, ch. 676, § 21, repealed, eff. July 1,1965, L. 1965, ch. 593, § 1.) Although commentators and textwriters for a number of years criticized this standard as being out of touch with the realities of modern thought on mental illness (see, e.g., Grlueck, Mental Disorder and the Criminal Law, 264-266 [1925], comment, 26 Albany L. Rev. 305, 306-308), the Legislature did not see fit to cause the statute *134 to be amended for many years. (See People v. Taylor, 138 N. Y. 398, 407-408; People v. Horton, 308 N. Y. 1, at p. 13.) The Governor, became aware of the shortcomings of M’Naghten as a result of a clemency hearing following our affirmance in People v. Horton (supra) and appointed a commission to recommend possible improvements which could be made to New York’s criminal responsibility statute. (See Gutman, People v. Horton: Is the M’Naghten Rule Adequate?, 7 N. Y. L. F. 320.)
This commission reported in 1958 (Governor’s Conference on the Defense of Insanity, Interim Report of the Study Committee [hereinafter referred to as the Foster Report]) that the then-current statute containing the M’Naghten Rule should be amended to overcome three major objections. First, it was reported that a difficulty arose in the use of the word “ know ” in M’Naghten because a defendant might be able to verbalize that some.act is wrong and yet have no depth of understanding as to what this means. Another defect with M’Naghten was said to be its emphasis on the actor’s cognitive capacity. The commission noted that the M’Naghten test disregarded the notion that an individual might have minimal awareness of some fact and at the same time lack the ability to control his conduct in light of this. Finally, the commission stated that M’Naghten taken on its face called for a total impairment of ability to know, whereas in even the most extreme psychoses it is impossible to say that the actor was totally bereft of knowledge or control.
The Foster Report suggested an adaptation of section 4.01 of the Model Penal Code (see A.L.I., Tentative Draft No. 4 [1955], p. 27, Comments at pp. 156-159) as a replacement for the M’Naghten Rule. In 1963, the Temporary Commission on Revision of the Penal Law and Criminal Code issued an interim report recommending a new insanity statute. This interim report embraced the conclusions and recommendations of the Foster Report. However, this proposal met with strong opposition from various groups, particularly the District Attorneys, and it was not until 1965 that section 1120 of the former Penal Law was amended to provide: “A person is not criminally responsible for conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to know or appreciate either:
“ (a) The nature and consequence of such conduct; or
*135 “ (b) That such conduct was wrong.”
As noted in the Practice Commentary to section 30.05 of the revised Penal Law (successor to former Penal Law, § 1120, as amd,) in Volume 39 (pt. 1) of McKinney’s Consolidated Laws of New York, “ The new or changed formula, while more limited than the original proposal, expands the old McNaghton Buie. Lack of ‘ substantial capacity ’ is a more realistic measure than the total impairment required for exculpation under McNaghton. Further, by relating the test to the defendant’s mental ‘ capacity,’ the standard is clarified, for, indeed, it is the-defendant’s power or capacity to know or appreciate about which the psychiatric witness actually testifies,
“ A new dimension is accorded the word ‘ know ’ by following •it with ‘ or appreciate. ’ This is designed to permit the defendant possessed of mere surface knowledge or cognition to' be excused, and to require that he have some understanding of the .legal and moral import of the conduct involved if he is to be ■held criminally responsible.”
In this case, the trial court instructed the jury that the law would absolve the defendant only if she suffered a defect .of reason as the result of a mental disease or defect which prevented her from having the substantial capacity to know or appreciate either the nature and consequences of the charged conduct or that such conduct was wrong. The court added that the People must prove both elements—i.e., that at the time of the killing the defendant knew she was hurting the decedent and that she knew this act was wrong. The court explained that mere surface knowledge is not sufficient to meet this requirement, and described surface knowledge as the type of knowledge children have of propositions which they can state, but cannot understand. Such knowledge, the court charged, has no depth and is divorced from comprehension. The Judge added, that the law intends to impose criminal responsibility upon the defendant only when and if it is proven beyond a reasonble1 doubt that she has some understanding, as opposed to surface understanding of the legal and moral import of the conduct involved.
In regard to the requirement that the defendant must know that the act was wrong, the court instructed the jury that to be held responsible the defendant must have realized that the act. *136 was against the law and against the commonly accepted standards of morality. A mere opinion contrary to the general morality, or a substantial propensity to commit crimes, the Judge noted, is not sufficient to indicate the defendant did not understand the act was wrong. As an example, the court explained that a man who kills because he is under the impression that he is a messenger of God sent to kill all the atheists, may understand the nature and consequences of his act, but does not know or appreciate that such conduct is wrong.
It is argued by the defendant that the use of the term “ defect of reason ” in the instruction misled the jury into believing that they were not permitted to acquit the defendant unless they found she was suffering from a mental defect. We do not agree. The use of the term “ defect of reason ” by the court, when read in the context of the entire charge, is clearly not misleading. In marshaling defendant’s psychiatric evidence, the Judge in his charge carefully pointed to testimony that she “ was not suffering from any mental defect, but a mental disease ”. Moreover, as previously mentioned, the court specifically instructed the jury that defendant would be relieved of criminal responsibility if they "found she was suffering from a defect of reason as a result of mental defect or disease which prevented her from having the substantial capacity to know or appreciate either the nature and consequences of the charged conduct or that such conduct was wrong. From this, it is apparent that the jury would not have been misled as the defendant suggests.
Defendant also challenges the court’s instruction in regard to “ surface knowledge ”. Reading the charge with regard to “ surface knowledge ” indicates that it is substantially the same as the discussion of the subject in the Foster Report and the 1963 Interim Report of the Temporary Commission on Revision of the Penal Law and Criminal Code.
Equally specious is the objection to the charge relating to “ substantial capacity to know or appreciate ”, as the terms are used in section 1120 of the former Penal Law.
As mentioned above, the jury was charged that the defendant should not be found guilty if she lacked the substantial capacity to know or appreciate either the nature and consequences of her act or that it was wrong. Explaining the meaning of ‘6 surface knowledge ”, as stated before, the court went on to say that *137 defendant could be held criminally responsible only if it were proven beyond a reasonable doubt that she had “ some understanding as opposed to surface understanding ” of the legal and moral import of the conduct involved. We conclude that the trial court adequately charged the degree of understanding required to comply with the apparent intention of the Legislature in changing the M’NagMen Rule.
In reference to her oral and written statements made to the police, defendant alleges error because (1) she was not advised of her right to counsel before making the statements, and (2) the statements were involuntary since she was under the influence of drugs (sleeping pills) and was suffering from a mental disease at the time.
There is no support in law for the first claim inasmuch as the lack of such advice does not render confessions inadmissible in trials begun before the date of the decision in Miranda v. Arizona (384 U. S. 436). (See People v. McQueen, 18 N Y 2d 337.) With respect to defendant’s argument that her alleged drug intoxication made the statements involuntary, we have held that self-induced intoxication does not ipso facto render a confession invalid (People v. Schompert, 19 N Y 2d 300). It is only when the defendant’s will has been overborne by interrogation (Townsend v. Sain, 372 U. S. 293, 307) or the state of intoxication has risen to the degree of mania, or the statements are shown by reference to other evidence to be unreliable, that a ■confession is rendered inadmissible (People v. Schompert, supra, at p. 305). The same criteria are applicable to admissions made by a defendant suffering from a mental disease. (Blackburn v. Alabama, 361 U. S. 199; People v. Howard, 27 A D 2d 796.)
The evidence adduced at the pretrial confession hearing reveals that “ Mrs. Adams was not interrogated” but had “talked freely with the witnesses.” While there is testimony that the defendant appeared drowsy and that she was taken to a hospital for treatment of a drug overdose, it appears that the defendant did ‘ ‘ know what she was doing when she gave statements ” to the police. Her comment that she would deny her admissions in court and her concern about receiving the death penalty clearly indicate that she was well aware of the import of her statements. Moreover, the reliability of the admissions is *138 further indicated when the defendant’s description of the crime is compared with the physical evidence at the scene.
The trial court found that the defendant, at the time she made the statements, was not under the influence of drugs so as to impair her ability and power to resist interrogation. The record clearly supports this conclusion and, moreover, indicates that the admissions were not the result of mania or police suggestions.
Defendant also contends that prejudicial error was committed because the Trial Judge refused to instruct the jury that if they found defendant not guilty by reason of insanity, she would be turned over to the Commissioner of Mental Health for further processing in accordance with the laws of this State.
There is conflict amongst the courts throughout the country on this issue. In a few jurisdictions it has been held that the instruction is proper and should be given. (Lyles v. United States, 254 F. 2d 725; Kuk v. State, 80 Nev. 291; State v. Shoffner, 31 Wis. 2d 412.) In approving the charge in question, the Supreme Court of Nevada noted, “ The purpose of the instruction is to inform the jurors that if they find the defendant insane, and acquit, he will not walk out a free man, but will be confined for medical treatment.” (Kuk v. State, supra, at p. 300.) However, in a majority of the jurisdictions, the courts have held that such an instruction should not be given. (See Pope v. United States, 298 F. 2d 507; Campbell v. State, 216 Ark. 878; State v. Park, 159 Me. 328; State v. Garrett, 391 S. W. 2d 235 [Mo.]; State v. Bracy, 215 N. C. 248; State v. Daley, 54 Ore. 514; State v. Hood, 123 Vt. 273.) Two basic reasons are given for the majority position: first, it is considered that to inform the jury about posttrial disposition of the defendant might confuse the issue or issues to be decided, thereby drawing the attention of the jury away from their chief function of judging the facts. (Pope v. United States, supra; State v. Park, supra.) Another reason given is'that such an instruction might tend to influence the jury to find the existence of mental irresponsibility by deviating from the strict confines of the evidence on mental disorders. In fact, it has been said that such an instruction actually amounts to an invitation for the jury to reach a compromise verdict and find the defendant mentally *139 irresponsible because he will be confined anyway. (State v. Garrett, supra.)
Aside from People v. Nagle (26 N Y 2d 707), it appears that the only other instance in which this court has dealt with the question was in People v. Newman (1 N Y 2d 875), where the trial court declined to give the requested instruction and we affirmed the conviction without opinion. It was, and is, our view that it would be improper for the court to give the instruction requested by the defendant. Consideration of punishment or disposition of the defendant is beyond the province of the jury. While it might be argued that the jury presently tends to consider possible punishment even though it is beyond their province, we conclude that to permit the instruction requested would only tend to exacerbate this problem. Such instruction might, as some of the majority jurisdictions have noted, prompt a jury to find insanity where the evidence might not otherwise have warranted such a finding.
The remaining contentions raised by the defendant have been fully considered by us and found to be without merit.
The order and judgment of conviction should be affirmed.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Breitel and Gibson concur.
Judgment affirmed.