[No. B001306. Second Dist., Div. Seven. Mar. 15, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JAMES MOORE, Defendant and Appellant.

542

**COUNSEL**

Thomas Kallay, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, S. Clark Moore and Edward T. Fogel, Jr., Assistant Attorneys General, Norman H. Sokolow and Sharlene A. Honnaka Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.—**

### I. INTRODUCTION

This appeal stems from a judgment based upon guilty verdicts in three counts of attempted murder and four counts of assault with a deadly weapon, and subsequent jury finding that appellant was sane at the time the convicted crimes were committed. Appellant urges three separate grounds for reversal: (1) that appellant's confession to a fellow inmate while incarcerated at the county jail was received into evidence in violation of *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199] because the inmate may have been a police informant; (2) that it was error for the trial court to discharge a regular juror and replace her with an alternate during the sanity phase of appellant's trial; and (3) that the trial court erred in refusing a jury instruction which outlined appellant's possible institutionalization should he be found to be not guilty by reason of insanity.

Each of appellant's contentions are directed towards the sanity phase of his trial. We find no merit in appellant's first two contentions. However, we conclude that appellant's sanity proceedings may have been prejudiced by the trial court's refusal to instruct the jury on the consequences of a verdict of "not guilty by reason of insanity." We therefore reverse and order the sanity phase retried.

### II. FACTS AND PROCEEDINGS BELOW

The facts in this case as found by the jury are neither complex nor subject to dispute on this appeal. On June 6, 1982, two uniformed police officers responded to a family disturbance call in a North Hollywood apartment complex. Upon arriving at the scene, the officers heard shouting and proceeded to an upstairs apartment where appellant and his girl friend were apparently arguing. The officers knocked on the door and were admitted by appellant's girlfriend, Kim. Appellant appeared "very rational" to the officers, and evidently promised there would be no further noise.

Two hours later, Officer James Flint, one of the original two officers, responded by himself to a second family disturbance call at the same apartment. Appellant once more promised there would be no more noise and apologized for having caused the disturbance. Flint testified appellant appeared again to be very calm and very rational. Flint left the apartment and began to walk towards the stairwell.

When he was approximately five yards from the apartment, Flint heard a gunshot. Although he did not realize it at the time, the shot passed completely through Flint's body. He flinched forward, looked back over his shoulder, and saw appellant in a "combat stance" holding a .45 automatic gun in his hands. Appellant fired a second shot, striking Flint on the left side of his back. Flint scrambled out of the hallway as a third shot hit his right hand. Appellant then fired a fourth shot. Once out of the hallway, Flint called for help on a hand-held police radio.

Shortly thereafter, a Mrs. Borrelli heard a noise in her garage, which abutted appellant's apartment complex. Upon investigating, Mrs. Borrelli found appellant in her garage brandishing a .357 caliber revolver. Appellant told her to get in the house, took her arm, and began escorting her toward the house.

Mr. Borrelli also heard the noise, investigated, and found his wife and appellant near the garage. Mrs. Borrelli told her husband that appellant had a gun, and Mr. Borrelli asked appellant not to hurt anyone as they would do what he said. When appellant lowered the gun, Mr. Borrelli attempted to disarm him. In the ensuing struggle, Mrs. Borrelli was shot, causing her to lose the use of her legs.

While Mr. Borrelli was struggling with appellant, a man named Thompson, who was cleaning a nearby pool, heard the shots and ran towards the Borrelli's garage. Thompson wrestled appellant to the ground, and Mr. Borrelli took the .357 revolver from the appellant. Appellant produced another pistol but dropped it when Thompson applied more pressure. Appellant then feigned a heart attack, crying "My heart, my heart," and reached for his left side. Appellant's jacket fell open revealing yet another gun, this time a .45 automatic. Thompson relieved appellant of this gun as well. Appellant then seized a pen from Thompson's shirt pocket and attempted to injure him with it. A bystander interceded, removed the pen, and apparently discarded it.

More officers arrived and the struggle continued. Appellant first tried to reach his own guns and then the officers' guns. Even more officers arrived and appellant was finally restrained and handcuffed. After being handcuffed, appellant made such articulate statements as "You should have seen the pig I just shot. He looked just like you," and "I shot that pig twice with my .45." Later, while being transported, appellant announced his expressed hope that Flint, the police officer he had shot, would die. More weapons were discovered when appellant's apartment was searched pursuant to a warrant, including a .20 gauge shotgun.

While incarcerated at county jail, appellant was placed in a cell with Leslie White, an inmate awaiting trial for grand theft auto. Because appellant had previously manifested suicidal intentions while in jail, a police sergeant requested White to "babysit" appellant. White testified appellant said "Hi," and in turn White asked appellant why he was in jail. Appellant responded he had "shot a cop," and was concerned about the length of sentence he could receive. Appellant had been told he could receive up to 60 years.

The next day, in the course of further conversation, White told appellant he was curious about appellant's having said he shot a police officer. Appellant then proceeded to explain the events of June 6, 1982, in detail. White testified that in the course of the conversation appellant said he "would have shot everybody there to get away," and he would do anything to convince people he was insane. Appellant asked for White's assistance in completing a Minnesota Multiphasic Personality Inventory Test to make it look as if he were crazy. Moore apparently also told White he would testify he thought the police officer who came to his apartment was his father and that he thought he was shooting at his father.

Appellant entered pleas of not guilty and also not guilty by reason of insanity. Because the insanity defense was fairly interposed, the trial was bifurcated into separate guilt and sanity phases pursuant to Penal Code section 1026. In the guilt phase, appellant was found guilty and convicted of three counts of attempted murder and four counts of assault with a deadly weapon.

During the sanity phase, extensive expert testimony by three psychiatrists on the subject of appellant's sanity was introduced. In essence, the witnesses agreed that Moore knew the wrongfulness of his conduct at the time the offenses were committed but lacked substantial capacity to conform his conduct to the law. There was also some testimony to the effect that appellant was capable of feigning mental illness, and that he had some control over his actions.

The jury found appellant to be sane at the time the convicted offenses were committed. Based on the jury's findings, the trial court sentenced appellant to some 19 years in prison and entered judgment accordingly. Appellant appeals.

### III. APPELLANT'S CONFESSION TO INMATE WHITE WAS PROPERLY ADMITTED AND DID NOT VIOLATE *MASSIAH* v. *UNITED STATES*

■ Appellant first contends on appeal that statements made to Leslie White, an inmate in appellant's jail cell, were received into evidence in

violation of *Massiah* v. *United States, supra,* 377 U.S. 201. Appellant argues the admission of this allegedly improper confession into evidence alone compels reversal. We disagree.

*Massiah* has long been interpreted in California to stand for the proposition that "incriminating statements made by a defendant after he has been formally charged by indictment or information . . . while . . . in custody are inadmissible where they have been *deliberately elicited* from him by enforcement agents or the police in the absence of his counsel." (*People* v. *Brice* (1966) 239 Cal.App.2d 181, 191 [48 Cal.Rptr. 562].) (Italics in original.)

In this case, the statements in question were made by appellant to White while both were in a jail cell in the county jail. Admittedly no counsel was present. Nonetheless these admissions are excludable under *Massiah* only if they were "deliberately elicited" from appellant by law enforcement agents or the police. Absent evidence that White was an agent of the police, no violation of appellant's rights is shown. (*People* v. *Hernandez* (1968) 263 Cal.App.2d 242, 255 [69 Cal.Rptr. 448].)

Appellant was placed into White's cell at county jail. Because appellant had previously manifested suicidal indications, a police sergeant asked White to "babysit" appellant. No evidence was adduced that White was asked to remember anything appellant said to him, or that White was even asked to talk with appellant.

Appellant urges White was "clearly" an informant by his own admission. White did admit to having been an informant in the past; however, we find the following exchange particularly noteworthy:

"Q. Have there been any types of promises of any nature made to you by any person to get you to testify?

"A. No.

". . . . . . . . . . . . . . . . . . . . . . .

"Q. Now, when you indicate that nobody has made any promises to you, that includes the District Attorney's Office and the police department; is that true?

"A. That's correct.

"Q. Has there been any type of a reward given to you for testifying in this matter?

"A. None.

"Q. You came forward freely and voluntarily?

"A. I did."

We are satisfied this exchange, coupled with the ostensible reason given that White was to "babysit" appellant, demonstrates White was not acting as an agent of the police to elicit a confession or information of any kind. There is no evidence in the record to support appellant's contention, raised for the first time on appeal, that White was acting pursuant to instructions from the police to "deliberately ellicit [*sic*]" incriminating information.

Appellant's confession to White was apparently spontaneous and voluntary. The confessions followed from a natural inquiry by White as to what appellant was charged with. Anyone would be naturally curious when someone claims they "shot a cop." We conclude no *Massiah* violation occurred and White's testimony was therefore properly admitted.

## IV. It Was Not Error to Excuse Juror Israel and Replace Her With an Alternate

■ Appellant next contends the trial court erred in excusing a regular juror and replacing her with an alternate. The substitution took place after the jury had been instructed in the sanity phase of the trial. The regular juror, a Mrs. Israel, wished to be excused to depart on a long-planned, extended journey.

■ The statutory authorization to discharge and replace a juror with an alternate is found in Penal Code section 1089. The section provides, inter alia, that a court may order a juror discharged if the juror "requests a discharge and good cause appears therefor." (Pen. Code, § 1089.) The decision to discharge a juror for "good cause" rests within the discretion of the trial court, and, absent an abuse of discretion, cannot be disturbed on appeal. (*People* v. *Abbott* (1956) 47 Cal.2d 362, 371 [303 P.2d 730].)

■ In the case at bar, the juror had informed the court even before voir dire had commenced of her impending departure, then some two months hence. The record reflects both counsel were aware of this fact but elected nevertheless to have Mrs. Israel remain on the jury for as long as possible. In addition, apparently anticipating the length of the trial, the trial judge wisely provided for voir dire and qualification of four alternate jurors. All four alternates were approved by both the prosecution and defense counsel.

After the guilt phase of appellant's trial had been decided, during the sanity phase, Mrs. Israel reminded the trial judge of her need to be excused. Thereafter the following colloquy took place outside the hearing of the jury between the court and defense counsel:

"MR. FOGELMAN: Your Honor, on behalf of the defendant, I have a problem with that, and it is a technical problem.

"It was my impression for whatever impressions are worth after six weeks of trial that during my argument I tended to focus my concentration and my eyes to the greater part on [her]. I felt by watching her gestures, her actions, her expressions *I felt [she] was potentially a strong juror for the defense.*

"THE COURT: Well, look, Mr. Fogelman, you know, your training and experience is as an attorney. You are certainly not a mind reader.

"MR. FOGELMAN: I agree, but *based on that* I could not stipulate to her being excused even though *there may very well be cause.*" (Italics added.)

As we read the record, it appears defense counsel was not objecting to the replacement of the juror because of insufficient cause; indeed, defense counsel all but conceded "good cause" was present. Counsel was apparently objecting to the release of this juror solely because she may have been a "defense juror."

California law is well-settled that a defendant's right to a fair and impartial jury does not include the right to have any particular individual sit as a juror in his case. (*People* v. *Howard* (1930) 211 Cal. 322, 325 [295 P. 333, 71 A.L.R. 1385]; see also *Darcy* v. *Moore* (1942) 49 Cal.App.2d 694, 700 [122 P.2d 281] [similarity of names coincidental].) Moreover, the court in *People* v. *Hall* (1979) 95 Cal.App.3d 299, 307 [157 Cal.Rptr. 107] reiterated that "where an alternate juror, approved by defendant in voir dire, is allowed to deliberate on the jury panel, the defendant bears a heavy burden to demonstrate that he was somehow harmed thereby."

In light of the extra precautions taken by the court to assure a full jury and with the notification of both counsel of the juror's impending departure, we conclude appellant has failed to carry this burden and hold the trial court did not abuse its discretion in discharging the juror.

### ■ V. IT WAS ERROR TO REFUSE TO INSTRUCT THE JURY REGARDING THE CONSEQUENCES OF A NOT GUILTY BY REASON OF INSANITY VERDICT

At the trial, the following instruction was requested by defense counsel but refused by the trial court: "If you find the defendant not guilty by reason

of insanity and the court considers his being at large a danger to the public, the court shall order him committed to an institution authorized by the Department of Mental Health to hold him in custody until he is no longer such a danger or is otherwise discharged by authority of law."

Appellant contends refusal of this instruction constitutes prejudicial error. As we shall explain, we agree that refusal of an informational instruction as to the general disposition of a defendant found not guilty by reason of insanity is prejudicial. However, we also conclude the proffered instruction was flawed in that it did not accurately reflect the law of this state. Because the error affected only appellant's sanity phase, we affirm the guilt phase, but reverse the judgment and order a new trial on the issue of appellant's sanity at the time of his convicted offenses.

The propriety of an instruction as to the consequences of a verdict of not guilty by reason of insanity appears to be an issue of first impression in this state. We have found no California authority directly in point, nor has one been cited to us by the parties. There have been, however, many court decisions and much discussion outside of our jurisdiction.[1]

In this case, the trial judge refused to give the instruction on two grounds: (1) the instruction was not the law of California; and (2) it "focus[ed] the jurors' attention on the matter of punishment or the flip side of punishment . . . [which] is certainly not the function of the jury." Concentrating first on the second ground, we begin with the premise the issue of a defendant's punishment is without the scope of the jury's function.

It is fundamental law in California that the trier of fact is not to consider the subject of penalty or punishment in arriving at its decision of guilt or innocence. (*People* v. *Moore* (1968) 257 Cal.App.2d 740, 750 [65 Cal.Rptr. 450] [similarity in names coincidental].) This notion derives from the traditional division of duty between the court and jury: a jury is to decide questions of fact placed before it; the court is to rule on questions of law. The issue of punishment being a question of law is exclusive to the court and therefore extraneous to the jury. To help focus the jury on its task and attempt to keep jurors from speculating on matters outside their function,

[1]See generally Annotation, 11 A.L.R.3d 737 (1967) and cases cited herein; Note, *Insanity Defense—Jury Instruction on Consequences of Acquittal* (1982) 9 N.Ky.L.Rev. 583, 591; Schwartz, *Should Juries Be Informed Of The Consequences Of The Insanity Verdict?* (1980) 8 J. Psychiatry & L. 167; Note, *A New Rule In North Carolina On Instructing The Jury On The Disposition Of A Defendant Acquitted By Reason Of Insanity* (1977) 13 Wake Forest L.Rev. 201; Note, *Defendant's Right To Jury Instruction On Consequences Of Verdict Of Not Guilty By Reason Of Insanity* (1970) 16 Wayne L.Rev. 1197, 1202-03; Arens et al., *Jurors, Jury Charges And Insanity* (1965) 14 Cath. U. L.Rev. 1; LaFave & Scott, Handbook on Criminal Law (1972) section 40.

California courts have prohibited any mention of postverdict proceedings in jury instructions. The rule is perhaps most vividly illustrated in capital cases.

In a line of cases beginning with *People* v. *Morse* (1964) 60 Cal.2d 631, 643 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], the California Supreme Court consistently has held that instructions informing the jury of the possibility of parole or pardon in capital cases constitutes reversible prejudicial error. For a jury charged with determining whether a defendant is to live or die, the court explained: "The objective situation is difficult enough without blurring the functions. The function of the jury is to consider the facts surrounding the crime and defendant's background, and upon that basis, reach its decision. The jury should not be invited to decide if the defendant will be fit for release in the future; it should not at all be involved in the issue of the time, if any, when the defendant should be released; it should not be propelled into weighing the possible consequences of the [parole board's] administrative action." (*Id.* at p. 643.)

The court continued that instructions as to the power of the trial judge and state Governor to reduce a death sentence to life imprisonment "tend to mislead the jury into assuming that the rendition of the penalty initiates a chain of proceedings by the court and the Governor which will achieve a reweighing of the sentence and possibly produce its nullification." (*Id.*, at p. 653.)

Weighing these considerations, the court held instructions, evidence and argument as to a possible administrative grant of parole or the powers of the trial judge and Governor to reduce the death penalty were impermissible and constituted prejudicial error. However, the court also recognized that "individual jurors often entertain some ideas of parole laws and might erroneously consider the effect of such laws upon a term of life imprisonment. They may ask the trial judge for information upon the subject; *it is not enough for the trial court merely to refuse the request and relegate them to ignorance.* To avoid such unanswered queries and to prevent latent misconceptions, we believe the trial court, at the time of rendition of all instructions, should inform the jury in general terms that life imprisonment can result in parole but that such matters are of no concern to it." (Italics added.) (*Id.*, at p. 647.)

The court recently reaffirmed *Morse*, holding the so-called "Briggs Instruction," added by the 1978 Death Penalty Initiative, unconstitutional on

state grounds in *People* v. *Ramos* (1984) 37 Cal.3d 136, 159, [207 Cal.Rptr. 800, 689 P.2d 430].[2]

In noncapital cases, California has adhered to the policy the jury is "not to involve the question of guilt with a consideration of the penalty," and our juries are so instructed. (*People* v. *Shannon* (1956) 147 Cal.App.2d 300, 306 [305 P.2d 101].) In *Shannon* Justice Moore (similarity in names coincidental) explained that "[w]ithout that advice a jury may permit their consideration of guilt to be deflected by a dread of seeing the accused suffer the statutory punishment." (*Id.*) Conversely, knowledge of the permitted or statutorily required punishment may cause or influence the jury to return a verdict designed to result in a particular penalty, rather than one based on the facts and applicable law of a case. The People argue through a "parity of reasoning" the subject of postverdict proceedings in the sanity phase is similarly extraneous to the jury. We disagree.

Under the general rule a jury has no concern with any postverdict matter. This would ostensibly include the disposition of a defendant found insane at the time of his crimes. Accordingly, many jurisdictions hold that where an insanity defense is properly raised, no instruction whatsoever may be given as to the consequences of an insanity verdict.[3] However, a growing number of jurisdictions reject this traditional view.

The seminal case is *Lyles* v. *United States* (D.C. Cir. 1957) 254 F.2d 725, certiorari denied (1958) 356 U.S. 961 [2 L.Ed.2d 1067, 78 S.Ct. 997], certiorari denied (1960) 362 U.S. 943 [4 L.Ed.2d 771, 80 S.Ct. 809], certiorari denied (1962) 368 U.S. 992 [7 L.Ed.2d 529, 82 S.Ct. 610]. (In

---

[2]An earlier decision of the California Supreme Court holding the Briggs Instruction unconstitutional under the federal Constitution was reversed by the United States Supreme Court. (*People* v. *Ramos* (1982) 30 Cal.3d 553, 591, revd. 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].)

[3]*Campbell* v. *State* (1950) 216 Ark. 878 [228 S.W.2d 470]; *State* v. *Wade* (1921) 96 Conn. 238 [113 A. 458]; *Garrett* v. *State* (Del.Sup. 1974) 320 A.2d 745; *People* v. *Meeker* (1980) 86 Ill.App. 162 [407 N.E.2d 1058]; *State* v. *Hamann* (Iowa 1979) 285 N.W.2d 180; *Payne* v. *Com.* (Ky. 1981) 623 S.W.2d 867, cert. den. 456 U.S. 909 [72 L.Ed.2d 167, 102 S.Ct. 1758]; *State* v. *Park* (1963) 159 Me. 328 [193 A.2d 1]; *Brown* v. *State* (1970) 8 Md.App. 462 [260 A.2d 665]; *State* v. *Bott* (1976) 310 Minn. 331 [246 N.W.2d 48]; *Smith* v. *State* (Miss. 1969) 220 So.2d 313; *State* v. *Garrett* (Mo. 1965) 391 S.W.2d 235; *State* v. *French* (1975) 166 Mont. 196 [531 P.2d 373]; *State* v. *Prevost* (1963) 105 N.H. 90 [193 A.2d 22]; *State* v. *Chambers* (1972) 84 N.M. 309 [502 P.2d 999]; *People* v. *Adams* (1970) 26 N.Y.2d 129 [309 N.Y.S.2d 145, 257 N.E.2d 610], cert. den. 399 U.S. 931 [26 L.Ed.2d 800, 90 S.Ct. 2262]; *State* v. *Boham* (1971) 29 Ohio App.2d 142 [279 N.E.2d 609; *State* v. *Daley* (1909) 54 Ore. 514 [103 P. 502]; *State* v. *Valenti* (1975) 265 S.C. 380 [218 S.E.2d 726]; *State* v. *Hood* (1963) 123 Vt. 273 [187 A.2d 499, 11 A.L.R.3d 732]; *Rollins* v. *Commonwealth* (1966) 207 Va. 575 [151 S.E.2d 622], cert. den. 386 U.S. 1026 [18 L.Ed.2d 469, 87 S.Ct. 1387]; *State* v. *Barnes* (1909) 54 Wash. 493 [103 P. 792]; *Lonquest* v. *State* (Wyo. 1972) 495 P.2d 575, cert. den. 409 U.S. 1006 [34 L.Ed.2d 299, 93 S.Ct. 432].

*United States* v. *Brawner* (D.C. Cir. (1972) 471 F.2d 969, 996-998, the *Lyles* instruction was modified to reflect changes in the law relating to commitment of defendants found not guilty by reason of insanity.) The *Lyles* court held that where the defense of insanity is fairly raised the trial judge is required to inform the jury as to the legal ramifications of a not guilty by reason of insanity verdict unless it affirmatively appears the defendant does *not* want the instruction. (*Id.,* at p. 729.) A number of other jurisdictions now adhere to this rule.[4]

*Lyles* Judges Prettyman and (now Chief Justice) Burger began by acknowledging the general rule, accepted in California, that ordinarily the jury has no concern with the consequences of its verdict. (*Id.,* at p. 728.) However, the *Lyles* court thought the general rule was inapplicable in the case of insanity. The court noted that "[j]urors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning . . . . We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts." (*Id.,* at p. 728.)

Other jurisdictions which *require* an instruction to be given cite *Lyles* and adopt the reasoning therein.[5]

Two jurisdictions require the instruction be given when the defense of insanity is raised by statute.[6]

Other jurisdictions do not require the trial judge to give an instruction *sua sponte,* but hold it prejudicial error to refuse to give such an instruction when requested by the defendant.[7] Some jurisdictions extend this rule to include requests from the jury or *sua sponte* instructions by the trial judge.[8]

---

[4]See *post,* footnotes 5, 7 and 8.

[5]*Roberts* v. *State* (Fla. 1976) 335 So.2d 285; *State* v. *Krol* (1975) 68 N.J. 236 [344 A.2d 289]; *Com.* v. *Mulgrew* (1977) 475 Pa. 271 [380 A.2d 349].

[6]Kansas Statutes Annotated (1981) section 22-3423; Tennessee Code Annotated (1984) section 33-7-303(e).

[7]*Schade* v. *State* (Alaska 1973) 512 P.2d 907; *People* v. *Thomson* (1979) 197 Colo. 232 [591 P.2d 1031]; *State* v. *Hammonds* (1976) 290 N.C. 1 [224 S.E.2d 595]; *State* v. *Nuckolls* (W.Va. 1980) 273 S.E.2d 87.

[8]*State* v. *Babin* (La. 1975) 319 So.2d 367; *Commonwealth* v. *Mutina* (1975) 366 Mass. 810 [323 N.E.2d 294] [extended to *sua sponte* instructions in *Com.* v. *Callahan* (1980) 380 Mass. 821 [406 N.E.2d 385]; *People* v. *Cole* (1969) 382 Mich. 695 [172 N.W.2d 354] [extended to *sua sponte* instructions in *People* v. *Rone* (1981) 109 Mich.App. 702 (311 N.W.2d 835)].

Two jurisdictions have enacted statutes requiring the trial court to instruct on postverdict insanity proceedings if requested by the defendant.[9]

Still other jurisdictions have adopted a middle ground. Nevada neither prohibits nor requires an instruction but allows the trial judge to instruct using his discretion. It is not error to refuse to instruct.[10] Wisconsin holds that while the instruction is "preferred," to refuse it does not constitute error.[11] Indiana, while following a general rule that no instruction is to be given, allows an instruction on postverdict proceedings if an erroneous view of the law has been "planted in their minds" as a result of prejudicial remarks.[12] Alabama found no error in refusing an instruction, but merely stated the proffered instruction did not state a correct principle of the applicable law.[13]

On the other hand, many jurisdictions reject the *Lyles* reasoning and refuse to instruct on any postverdict proceedings after a verdict of not guilty by reason of insanity.[14]

Distilling these authorities, we find three major arguments offered against giving such an instruction: (1) as a general rule the jury is not concerned with a defendant's posttrial punishment, and to give such an instruction invites the jurors to speculate on matters beyond their province and perhaps return a compromise verdict (e.g., *People* v. *Adams* (1970) 26 N.Y.2d 129 [309 N.Y.S.2d 145, 257 N.E.2d 610, 614], citing *State* v. *Garrett, supra,* 391 S.W.2d 235, 242); (2) doubt that people in general are as ill-informed on postinsanity verdict disposition as the *Lyles* opinion assumes, *State* v. *Hood, supra,* 187 A.2d 499, 501; and (3) the procedural aspects of requesting the instruction tend to give justice an "a la carte quality." (*Id.*) We deal with each in turn.

The first and foremost argument against the instruction is that a jury ordinarily is not concerned with a defendant's postverdict punishment. The People urge that by analogy this general rule, accepted in California, controls this case. Such an analogy does not withstand close scrutiny. Commenting on this precise issue, the Louisiana Supreme Court not-

---

[9]Hawaii Revised Statutes (1976) section 704-402(2) amended 1980 Act 222; Missouri Revised Statutes (Vernon Supp. 1984) section 552.030, subdivision 7.

[10]*Kuk* v. *State* (1964) 80 Nev. 291 [392 P.2d 630] (extended in *Bean* v. *State* (1965) 81 Nev. 25 [398 P.2d 251], cert. den. 384 U.S. 1012 [16 L.Ed.2d 1030, 86 S.Ct. 1932]).

[11]*State* v. *Shoffner* (1966) 31 Wis.2d 412 [143 N.W.2d 458].

[12]*Dipert* v. *State* (1972) 259 Ind. 260 [286 N.E.2d 405].

[13]*Carr* v. *State* (1967) 43 Ala.App. 642 [198 So.2d 791], certiorari denied 389 U.S. 877 [19 L.Ed.2d 165, 88 S.Ct. 175].

[14]See *ante,* footnote 3.

ed ██ "[i]nstructions as to a sentence following a guilty verdict concern only the *length* of a defendant's incarceration whereas possible confusion in a juror's mind as to the ramifications of a verdict of not guilty by reason of insanity pertains to the very nature of the defendant's disposition—whether or not he will be detained and the circumstances of the detention." (*State v. Babin, supra,* 319 So.2d 367, 378-379 [Barham, J., dis. to original holding subsequently modified on rehearing] (italics in original).) We are satisfied instructions as to postverdict commitment proceedings are distinguishable from the prohibited instructions on postverdict punishment.

The argument continues that to give the instruction invites the jurors to speculate on matters beyond their province and perhaps return a compromise verdict. Empirical data indicates that regardless of whether an instruction is given jurors *do* concern themselves with the consequence of the insanity verdict; indeed, such speculation has been shown to be "one of the most important factors" in jury deliberations. (Weihofen, *Procedure For Determining Defendant's Mental Condition Under The American Law Institute's Model Penal Code* (1956) 29 Temp. L.Q. 235, 247.) Such discussion among jurors without the benefit of a correct instruction may very well cause them to proceed on an erroneous basis. We conclude the danger of an erroneous assumption during jury deliberations overshadows any possible invitation to speculate on matters likely to be discussed anyway.

Moreover, because of the bifurcated guilt/sanity trial system in California, the issue of a defendant's "guilt" has already been decided before the issue of the defendant's sanity is placed before the jury. Thus, a postverdict disposition instruction would do little to confuse the jury on the issue of a defendant's guilt.

██ The *Lyles* court based its holding on the fact that unlike verdicts of guilty and not guilty, verdicts of not guilty by reason of insanity have no commonly understood meaning. (254 F.2d at p. 728.) Other courts have been openly critical of this premise, especially *State v. Hood, supra,* 187 A.2d 499, 501, "[w]e doubt that people in general are as ill-informed on the subject as the [*Lyles*] opinion assumes." We believe, however, this assumption to be well-founded. Our own procedure in California, described in detail in Penal Code sections 1026-1026.2 is highly complex and technical. (Pen. Code, §§ 1026-1026.2.) We believe it is possible that at least some jurors are unaware of the postverdict disposition of an insane defendant. The very phrase "*not guilty* by reason of insanity" itself could mislead some jurors to assume the defendant will walk free just as would an accused found not guilty for other reasons.

Finally, some courts have been critical of the procedural aspects of *Lyles* and its progeny. *Lyles* itself held the trial judge *must* instruct the jury as to

the consequences of an insanity verdict *unless* the defendant did not desire the instruction given. (254 F.2d at pp. 728-729.) The Vermont Supreme Court noted "the [*Lyles*] opinion does not address itself to the problem of what the trial court should do if the defendant affirmatively makes clear he does not desire the instruction but the prosecution does. . . ." (*State* v. *Hood, supra,* 187 A.2d 499, 501.) *People* v. *Thomas* (1980) 96 Mich.App. 210 [292 N.W.2d 523] suggested the instruction should be given *sua sponte* in all cases involving the insanity defense. See also, Note, *Insanity Defense—Jury Instruction On Consequences Of Acquittal, supra,* 9 N.Ky.L.Rev. 583, 591; Note, *Defendant's Right To Jury Instruction On Consequences Of Verdict Of Not Guilty By Reason of Insanity, supra,* 16 Wayne L.Rev. 1197, 1202-1203.

We are guided, however, in a different direction by a recent California Supreme Court case involving an analogous issue. In *People* v. *Ramos, supra,* 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], our high court considered whether courts should *sua sponte* instruct jurors to disregard the possibility a Governor might commute a sentence of death or life without possibility of parole. The court rejected this approach. Instead it ruled the instruction should be given only if requested by the defendant or a juror.

"When the jury raises the commutation issue itself [. . .] the matter obviously cannot be avoided and is probably best handled by a short statement indicating that the Governor's commutation power applies to both sentences but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation . . . .

". . . . . . . . . . . . . . . . . . . . . . . .

"[P]ermitting the defendant to assess the relative cost and benefit of a cautionary instruction in a particular case—appears appropriate with regard to the commutation issue." (*People* v. *Ramos, supra,* 37 Cal.3d at pp. 159, 160.) The same approach and same rationale also appear appropriate with regard to advising jurors about the consequences of a verdict of "not guilty by reason of insanity" and cautioning them not to base their decision on this factor.

### Conclusion

The Michigan Supreme Court considered this problem to be a judicial choice between "1) the possible miscarriage of justice by imprisoning a defendant who should be hospitalized, due to refusal to so advise the jury; and 2) the possible 'invitation to the jury' to forget their oath to render a true verdict according to the evidence by advising them of the consequence

of a verdict of not guilty by reason of insanity." (*People* v. *Cole, supra,* 172 N.W.2d 354, 366].) We conclude, as did the Michigan Supreme Court, the reasons supporting the first proposition far outweigh the dangers expressed in the second proposition.[15] Therefore, we hold that whenever requested by the defense or by the jury, the trial judge should give an instruction as proposed *infra*. We likewise hold barring unusual circumstances no other allusion should be made to the defendant's postverdict disposition. Arguments or evidence are not permitted.

We agree, however, with the trial judge that the proffered instruction in the instant case did not accurately reflect the law of our state. Accordingly, for the general guidance of the trial court we recommend an instruction along the following lines:

"If the jury returns a verdict of 'not guilty by reason of insanity' it does not mean the defendant will be released from custody as it would were he found to be 'not guilty' of the criminal act itself. Instead he will remain in confinement while the courts determine whether he has fully recovered his sanity. If he has not he will be placed in a hospital for the mentally disordered or equivalent facility or in out-patient treatment, depending upon the seriousness of his present mental illness. Moreover, he cannot be removed from that placement unless and until the court determines and finds the defendant's sanity has been fully restored, in accordance with the law of California, or until the defendant has been confined for a period equal to the maximum period of imprisonment which could have been imposed had he been found *guilty* rather than not guilty by reason of insanity. Where necessary, the defendant can be retained in confinement in a mental facility beyond the maximum term of imprisonment which could have been imposed after a guilty verdict but only after an independent sanity hearing where the defendant has the right to a trial on that issue before a new jury.

"So that you will have no misunderstandings relating to a verdict of not guilty by reason of insanity, you have been informed as to the general scheme of our mental health laws relating to a defendant insane at the time of his crimes. You are now instructed, however, that what happens to the defendant under these laws is not to be considered by you in determining whether the defendant was sane or not at the time he committed his crimes. You may not speculate as to if, or when, the defendant would be found fully sane again. It is not your function to decide whether the defendant is now sane. So far as you are concerned, you are to decide only whether the

---

[15]Accord Schwartz, *Should Juries Be Informed Of The Consequences Of The Insanity Verdict?, supra,* 8 J. Psychiatry & L. 167; LaFave & Scott, *supra,* Handbook on Criminal Law, section 40. (*Lyles* is the "better view" and is gaining support.)

defendant was sane at the time he committed his crimes. If upon consideration of the evidence you believe defendant was insane at the time he committed his crimes, you must assume that those officials charged with the operation of our mental health system will perform their duty in a correct and responsible manner, and that they will not release this defendant unless he can be safely returned into society. It would be a violation of your duty as jurors if you were to find the defendant sane at the time he committed his offenses because of a doubt that the Department of Mental Health or the courts will properly carry out their responsibilities."

The instruction is derived from California Penal Code section 1026 and *People* v. *Morse, supra,* 60 Cal.2d 631, 648. We offer this instruction only for guidance of the trial court should it retry the sanity issue in the instant case. We welcome and encourage the appropriate committees and organizations to improve upon the substance and language of our initial version for use in other cases. Furthermore, we wish to remove any doubt by expressly declaring this opinion is to apply prospectively not retroactively.

VI. Disposition

Accordingly, the judgment of conviction is affirmed. The judgment in the sanity phase is reversed and the case remanded for further proceedings consistent with this opinion.

Lillie, P. J., and Thompson, J., concurred.

Petitions for a rehearing were denied April 12, 1985. Lillie P. J., was of the opinion that the petitions should be granted. Respondent's petition for review by the Supreme Court was denied May 16, 1985. Mosk, J., and Lucas, J., were of the opinion that the petition should be granted.