[Crim. No. 13354. Third Dist. July 10, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT JAMES DENNIS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, the introduction, facts, parts II, IV and disposition are certified for publication; parts I and III are not to be published.

**COUNSEL**

Thomas W. Condit, under appointment by the Court of Appeal, and Dana Frank Winterrowd for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Joel Carey and Richard Thomson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CARR, J.**—A jury convicted defendant of mayhem (Pen. Code, § 203)[1] and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)) and found true all alleged special circumstances and enhance-

---

[1] All further statutory references are to the Penal Code.

ments.[2] After the jury found defendant was sane at the time he committed the offenses, the court imposed concurrent life terms as mandated by statute. (§ 667.7.)

On appeal, defendant contends (1) the trial court erred in not granting defendant's motion for a change of venue (§ 1033); (2) the injury inflicted did not constitute mayhem; (3) the trial court erred in not instructing on the lesser included offense of simple assault; and (4) the trial court erred in not giving defendant's proposed instruction concerning the consequences of finding defendant not guilty by reason of insanity. We agree with the latter contention and shall remand for retrial on the sanity issue. In all other respects, we shall affirm the judgment.

## FACTS

At 6:30 a.m. on October 6, 1982, a motorist passed a park in Davis and noticed a man crouched over an object. The man stood up and began pulling what the passerby first believed to be a raincoat or dog. He then realized two people were struggling. He got out of his car and ran toward the scene, where he saw the victim being beaten. He chased the assailant without success. Defendant was arrested in his apartment approximately five hours later.

The victim, a 96-year-old woman, was severely beaten on the head. In addition to general bruising and lacerations, she suffered broken facial bones and eye injuries requiring corrective surgery.

## DISCUSSION

### I*

. . . . . . . . . . . . . . . . . . . . . . .

### II

Defendant contends there was no evidence to support the jury's finding that defendant committed mayhem.

---

[2]At the time the jury returned its verdict of guilty, it also found the victim was 60 years of age or older (§ 1203.09), and that defendant actually inflicted great bodily injury (§ 12022.7). In a subsequent proceeding, the jury also found true the following: (1) defendant was on parole at the time he committed the offense in count I (§ 1203.085, subd. (b)); (2) defendant had previously served prison terms for two violent felonies within the meaning of section 667.5, subdivision (a) (counts III and IV); and (3) defendant inflicted great bodily injury in counts I and II and had served two prior prison terms as specified in section 667.7.

*See footnote, *ante,* page 1135.

Section 203 states: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, . . . or puts out an eye, . . . is guilty of mayhem." The jury was instructed, "The phrase 'puts out an eye' refers to a case in which an eye is entirely removed, and also to a case in which the eye has been rendered entirely useless or injured to the extent that its possessor cannot use it for the ordinary and usual purposes of life." (CALJIC 9.31; see also *People* v. *Green* (1976) 59 Cal.App.3d 1, 3 [130 Cal.Rptr. 318]; *People* v. *Nunes* (1920) 47 Cal.App.346, 350 [190 P. 486].)

Mayhem is committed when the inflicted injury not only completely destroys the victim's eyesight (*People* v. *McWilliams* (1948) 87 Cal.App.2d 550 [197 P.2d 216]), but also when it causes impairment less than total blindness. In *People* v. *Green, supra,* 59 Cal.App.3d 1, a machete blow to the victim's right eye dislocated his lens. As a result, the victim lost the ability to focus and suffered further permanent damage from increased fluid pressure levels in his eye. With a corrective lens, the victim's vision was 20/60, rather than the normal 20/20, but the lens distorted his peripheral vision and caused double vision. (Pp. 2-4.)

Similar injuries occurred in the present case. The treating ophthalmologist testified the victim's left lens was dislocated and pulled forward, requiring surgical removal to reduce interocular pressure. The lens in the victim's right eye was also partially dislocated but was treated without surgery. Removing the left lens caused the victim to lose the ability to focus. With corrective lenses, her visual acuity was 20/50 in the left eye but wearing glasses blurred the vision in her right eye. She could read only large print. The victim's niece testified her aunt was unable to read books after the assault and could read only headlines. She further stated her aunt could walk around a room only by holding onto walls and furniture.[10]

Although the victim's eye was not "rendered entirely useless," the injuries were such that the victim could not use her eye for the "ordinary and usual purposes of life." The corrective glasses helped alleviate the lack of focus in her left eye, but the eye itself remained permanently damaged.

The jury properly found the injuries to the victim's eye constituted mayhem.

---

[10]The victim also suffered from early cataract changes in her right eye. The opthamologist was unable to determine if cataracts had also been present on the left lens. There was additional evidence of glaucoma, but the record does not indicate which eye was affected. The ophthalmologist characterized the victim's vision as "mildly impaired" before the assault.

III*

. . . . . . . . . . . . . . . . . . . . . . .

IV

Defendant offered, and the court refused, the following instruction concerning the consequences of finding defendant not guilty by reason of insanity (NGI): "If you find the defendant not guilty by reason of insanity, the court shall order him to be committed to an institution authorized by the Department of Mental Health to hold him in custody until he is no longer such a danger or is otherwise discharged by authority of law."

■ Defendant contends the trial court's refusal of this instruction constitutes prejudicial error. Defendant's instruction does not properly reflect California law on commitment. However, we agree defendant was entitled to an accurate instruction on this issue. Because the proceedings may have been prejudiced by the court's refusal to instruct on the commitment process, we shall reverse and order the sanity phase retried.

Defendant argues this instruction is necessary to prevent jurors from speculating that defendant, who had just been found guilty of two violent crimes, would immediately be released into the community if an NGI verdict were returned.[12] As Judge (now Chief Justice) Burger pointed out, "Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning." (*Lyles* v. *United States* (D.C. Cir. 1957) 254 F.2d 725, 728.)[13]

This issue was first considered by a California court in the recent case of *People* v. *Moore* (1985) 166 Cal.App.3d 540 [211 Cal.Rptr. 856] (hg. den.), in which the court found that NGI verdicts are often not understood,

---

*See footnote, *ante*, page 1135.

[12]Unlike the situation in *People* v. *Modesto* (1967) 66 Cal.2d 695, 708 [211 Cal.Rptr. 856] or *People* v. *Smith* (1973) 33 Cal.App.3d 51, 71 [108 Cal.Rptr. 698], the prosecutor in the present case neither stated nor implied defendant would walk free if the jury returned an NGI verdict.

[13]Other courts and scholars have found otherwise, believing jurors do, in fact, understand the consequences of a NGI verdict. (See, e.g., *State* v. *Hood* (1963) 123 Vt. 273 [187 A.2d 499, 502, 11 A.L.R.3d 732]; Simon, The Jury and the Defense of Insanity (1967) p. 90, criticized in Schwartz, *Should Juries Be Informed Of The Consequences Of The Insanity Verdict?* (1980) 8 J. Psychiatry & L. 167, 173-174.)

particularly given the complexities of the state's commitment procedures found in sections 1026-1026.2 (p. 554). Because the consequences of an NGI verdict go to the very nature of the disposition, rather than the length of punishment, the *Moore* court determined that an instruction of the sort proposed by defendant is not inconsistent with the general rule prohibiting jurors from considering postverdict punishment in reaching their decision. (Pp. 553-554.) Analogizing to *People* v. *Ramos* (1984) 37 Cal.3d 136, 159, 160 [207 Cal.Rptr. 800, 689 P.2d 430], the court held an instruction on the consequences of an NGI verdict must be given whenever requested by the jury or defendant. (*People* v. *Moore, supra,* 166 Cal.App.3d at p. 555.) We agree with that analysis.

As in *Moore,* however, defendant's proposed instruction does not accurately reflect the commitment procedures established in Penal Code sections 1026-1026.2. For the guidance of the court on remand, we recommend the following instruction proposed in *Moore,* derived from Penal Code section 1026 and *People* v. *Morse* (1964) 60 Cal.2d 631, 648 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]: " 'If the jury returns a verdict of "not guilty by reason of insanity" it does not mean the defendant will be released from custody as it would were he found to be "not guilty" of the criminal act itself. Instead he will remain in confinement while the courts determine whether he has fully recovered his sanity. If he has not he will be placed in a hospital for the mentally disordered or equivalent facility or in out-patient treatment, depending upon the seriousness of his present mental illness. Moreover, he cannot be removed from that placement unless and until the court determines and finds the defendant's sanity has been fully restored, in accordance with the law of California, . . .

" 'So that you will have no misunderstandings relating to a verdict of not guilty by reason of insanity, you have been informed as to the general scheme of our mental health laws relating to a defendant insane at the time of his crimes. You are now instructed, however, that what happens to the defendant under these laws is not to be considered by you in determining whether the defendant was sane or not at the time he committed his crimes. You may not speculate as to if, or when, the defendant would be found fully sane again. It is not your function to decide whether the defendant is now sane. So far as you are concerned, you are to decide only whether the defendant was sane at the time he committed his crimes. If upon consideration of the evidence you believe defendant was insane at the time he committed his crimes, you must assume that those officials charged with the operation of our mental health system will perform their duty in a correct and responsible manner, and that they will not release this defendant unless he can be safely returned into society. It would be a violation of your duty as jurors if you were to find the defendant sane at the time he committed

his offenses because of a doubt that the Department of Mental Health or the courts will properly carry out their responsibilities.' "[14] (*People* v. *Moore, supra,* 166 Cal.App.3d at pp. 556-557.)

### DISPOSITION

The judgment of conviction is affirmed. The judgment in the sanity phase is reversed and remanded for further proceedings consistent with this decision.

Regan, Acting P. J., concurred.

**BLEASE, J.**—I concur in the opinion except as to part II, as to which I dissent.

The majority opinion holds that the phrase "puts out an eye" in the mayhem statute (Pen. Code, § 203) includes an injury resulting in a corrected vision of 20/60. Plainly that cannot be the case if we give, as we must (*People* v. *One 1940 Ford V-8 Coupe* (1950) 36 Cal.2d 471, 475 [224 P.2d 677]), plain meaning to the words of the statute. "[P]uts out an eye" has been in the mayhem statute unchanged since 1872. It means, by the most obvious of definitions, "[t]o destroy the sight of, to blind (an eye), either by literally gouging it out, or by burning or other means" (Oxford English Dict. (1978) "put out," p. 1651); to wit, to render "permanently blind." (*People* v. *McWilliams* (1948) 87 Cal.App.2d 550, 552 [197 P.2d 216].) The cases which say to the contrary (*People* v. *Green* (1976) 59 Cal.App.3d 1 [130 Cal.Rptr. 318], *People* v. *Nunes* (1920) 47 Cal.App. 346 [190 P. 486]), upon which the majority rely, simply ignore the plain meaning and thereby usurp the function of the Legislature. That is a power we do not have. (Code Civ. Proc., § 1858.) I would reverse the conviction for mayhem. That would, upon a finding of his sanity, leave the defendant with the same life penalty now imposed.

Appellant's petition for review by the Supreme Court was denied October 30, 1985.

---

[14]In arguing against such an instruction, the People suggest the jury should also be informed of the minimum number of days defendant may be confined. We disagree. The jury can no more be concerned with the possible length of a defendant's commitment than with the possible length of a prison term.